## SCHUMACHER et al. v. BUTTONLATH MFG. CO.

(Circuit Court of Appeals, Ninth Circuit. August 20, 1920. Rehearing Denied October 15, 1923.)

No. 3795.

1. Patents ⨁26(1)—Combination of elements in manufacture of plaster board may constitute invention.

The art of combining all the elements entering into manufacture of high quality of plaster board of size, strength, and durability, which can only be accomplished by intimate knowledge of nicely balanced relation of each to the other, and the making of it effectively and economically at timely successive stages within the time-setting period of the plaster material, may display invention of a high order.

2. Patents ⨁112(5)—Burden on one denying that patentee was first inventor.

Patent itself is prima facie evidence that patentee was the first inventor, and casts on him who denies such fact the burden of sustaining his denial by proof beyond a reasonable doubt.

3. Patents ⨁118—Question whether disclosure of patent is sufficient is one of fact.

The question whether patent for process for manufacturing plaster board contains insufficient disclosure of the process, because calling for use of paper treated to retard permeation by moisture, without explaining how paper may be treated to accomplish that purpose, is one of fact.

4. Patents ⨁312(3)—Evidence held insufficient to support finding that disclosure of process was insufficient.

In suit for infringement of patent for process for making plaster board, calling for use of paper treated to retard permeation by moisture, evidence *held* insufficient to warrant finding that disclosure was insufficient, because it was not shown how the paper should be treated to accomplish that purpose.

5. Patents ⨁16—Finding claims devoid of invention is one of fact.

Finding that claims of patent are devoid of invention is a finding of fact.

6. Patents ⨁328—No. 1,176,322, for process for making plaster board, held valid, not anticipated, and infringed.

The Schumacher patent No. 1,176,322, for process of making plaster board, *held* not invalid, as not sufficiently disclosing the process to satisfy

Rev. St. § 4888, claims 1 to 7 not invalid for want of invention, claims 8 and 9 not invalid because anticipated, or for want of invention, and all claims infringed in manufacture of defendant's products, except so far as manufactured under a patent.

7. **Patents ⬅312(3)—Evidence held not to sustain defense of sale more than two years before application.**

Evidence in suit for infringement of process patent *held* insufficient to sustain defense that the invention, the product or the process, was placed on sale or offered for sale before or within two years prior to the application, so as to defeat the patent, under Rev. St. § 4886 (Comp. St. § 9430).

8. **Patents ⬅310(7)—Allegation negativing abandonment admitted, when not denied.**

Where allegation in patent infringement suit that the invention was not abandoned was not denied in the answer, it was admitted, in view of Rev. St. § 4920 (Comp. St. § 9466).

9. **Patents ⬅51(1)—Process patent can only be anticipated by similar process.**

Process patent can only be anticipated by a similar process, and not by existence of prior device that might be made effective in carrying out the particular process.

10. **Patents ⬅328—1,197,553, 1,259,049, and 1,286,801, for apparatus for making plaster board, held infringed.**

The Schumacher patents, Nos. 1,259,049, 1,286,801, for apparatus for use in manufacture of plaster board, *held* infringed, and the Schumacher patent, No. 1,197,553, infringed, except so far as defendant's products were manufactured under a particular patent.

Dietrich, District Judge, dissenting in part.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Oscar A. Trippet, Judge.

Suit by John Schumacher and another against the Buttonlath Manufacturing Company to enjoin the defendant from the further manufacture, use, and sale of any of the plaintiffs' inventions of processes and apparatus for the manufacture of plaster board and the like, mentioned in the complaint, and for an accounting for damages sustained by plaintiffs for infringements by defendant of plaintiffs' inventions. From a decree granting plaintiffs insufficient relief, they appeal. Reversed in part, and remanded in part, with directions.

Raymond Ives Blakeslee, Joseph F. Westall, Ernest L. Wallace and Louis J. Euler, all of Los Angeles, Cal., for appellants.

John G. Mott, Albert M. Cross, and G. Benton Wilson, all of Los Angeles, Cal., for appellee.

Before MORROW and HUNT, Circuit Judges, and DIETRICH, District Judge.

MORROW, Circuit Judge. This is an action by John Schumacher and Joseph E. Schumacher against the Buttonlath Manufacturing Company to restrain infringement of certain patents issued to and owned by plaintiffs, namely: No. 1,176,322, dated March 21, 1916, containing nine claims, for improved processes of making plaster board and the like (wallboard), for use in building construction; No. 1,176,-860, dated March 28, 1916, containing four claims, for improved processes of making plaster board, such as is used in the building arts (wallboard) both for internal and external walls; No. 1,197,553, dated

September 5, 1916, containing nine claims, for improvements in feeding and severing apparatus, having relation to patent No. 1,176,322, and for carrying on the processes therein described; No. 1,329,634, dated February 3, 1920, containing seven claims, for plaster board trimming apparatus; No. 1,259,049, dated March 12, 1918, containing four claims, for improvements in apparatus for finishing plaster board and the like, having relation to 1,176,322, and for carrying on the processes therein described.; No. 1,286,801, dated December 3, 1916, containing three claims, for improvements in apparatus for finishing plaster board and the like, having relation to patent No. 1,259,049, and for the completion of the processes described in the process patents—in all six patents, containing thirty-six claims.

These patents may be classified as two patents for improved processes in making plaster boards and the like (wallboards), and four patents for improved apparatus for carrying on the processes of the two process patents. Upon motion of the defendant that the plaintiffs specify the claims in these patents on which they would rely, plaintiffs elected to proceed upon all the claims in all the patents.. Subsequently plaintiffs withdrew patent No. 1,329,634 and its seven claims for a plaster board trimming machine, and gave notice that they would not rely on claims 6 and 9 of patent No. 1,197,553, for a feeding and severing apparatus.

The hearing proceeded upon the remaining five patents, containing twenty-seven claims, resulting, after a full hearing, in an interlocutory decree, adjudging: That patent No. 1,176,322 is void in law as to claims 1 to 7, for want of invention, and that claims 8 and 9 had been anticipated, and the patent void as to such claims. Injunction denied. That patent No. 1,176,860 is good and valid in law as to each and all the claims, and infringed by defendant in making Peters wallboard, but not infringed in making buttonlath. Injunction and accounting ordered accordingly. That patent No. 1,197,553 is good and valid in law as to claims 1, 2, 3, 4, 5, 7, and 8, and infringed by defendant in making Peters wallboard, but not in making buttonlath. Injunction and accounting ordered accordingly. That patent No. 1,259,049 was good and valid in law as to each and all the claims in said patent, but not infringed by defendant. That patent No. 1,286,801 was good and valid in law as to each and all the claims in said patent, but·not infringed by defendant.

From this decree plaintiffs have appealed to this court, assigning errors on the part of the trial court in adjudging that patent No. 1,-176,322 was void in law as to claims 1 to 7, being devoid of invention, and that claims 8 and 9 had been anticipated; in adjudging that defendant had not infringed any claim or claims of said patent No. 1,176,-322; in adjudging that patent No. 1,197,553 had not been infringed by defendant in making buttonlath; in adjudging that patent No. 1,176,-860 had not been infringed by defendant in making buttonlath; in adjudging that patents No. 1,259,049 and No. 1,286,801 had not been infringed by defendant. The appeal brings before us the five patents submitted to the trial court, containing twenty-seven claims.

The decree is in some particulars both for and against the opposing parties. The defendant has accepted the decree, and that part of it in

favor of the plaintiffs has become the law of the case. The plaintiffs having brought here for review only such parts of the decree as are adverse to its claims, this court, for a clear understanding of the controversy, will not only consider the provisions of the decree against the plaintiffs, but also some features of the decree in favor of the plaintiffs, from which no appeal has been prosecuted.

The several inventions involved in this controversy relate to a process of making plaster board and the like (wallboard) for use in building construction and the apparatus for carrying such process to completion. The plaintiffs, in their application filed in the Patent Office on April 23, 1915, for the first process, patent No. 1,176,322 (adjudged invalid by the lower court), specified that they had invented a new and useful process of making plaster board and the like, and that the invention related to improved processes of making plaster board for use in building construction. In their application for the second process, patent No. 1,176,860, filed August 6, 1915 (adjudged valid by the lower court), they specified that the invention related to improved processes of making plaster board, such as used in the building arts, both for the internal and external walls.

In their application for a patent for a feeding and severing apparatus, patent No. 1,197,553, filed April 29, 1916 (adjudged valid by the lower court), they specified that the invention related to new and useful improvements in feeding and severing apparatus; that apparatus of this general character was disclosed in another application for patent, filed April 23, 1915, for the process of making plaster board and the like, patent No. 1,176,322.

In their application for a patent, filed May 19, 1916, for an apparatus for finishing plaster board and the like, patent No. 1,259,049 (adjudged valid by the lower court), they specified that the invention related to apparatus for finishing plaster board and the like, although not strictly limited to the finishing of this particular class of products or articles, but extended in its scope to the finishing of anything to which the features and characteristics of the invention might be adapted. It is specified further that in its more specific aspects, with relation to plaster board and the like, it is related to the subject-matter of prior inventions patented by plaintiffs, an instance of which was the invention of patent No. 1,176,322 (adjudged invalid by the lower court).

In their application for a patent for an improvement in apparatus for finishing plaster board and the like, filed December 7, 1917, patent No. 1,286,801 (adjudged valid by the lower court), they specified that the invention related to improvements in apparatus for finishing plaster board and the like prior to the drying of the board; that it was in part a division of their application for patent No. 1,259,049 (adjudged valid by the lower court), and resided in the provision of means for supporting plaster board, so that it may be readily transported and safely handled while moist and before the hardening thereof, without the tearing or derangement thereof.

These twenty-seven claims, contained in plaintiffs' five patents involved in this appeal, are all combination claims, and relate to the processes of making plaster board and the like, and the apparatus used and useful in making such plaster board. While separately patented,

these inventions are so intimately related to each other in the actual practice of making plaster board of the character and quality produced by plaintiffs under their processes and apparatus, and are so dependent one upon the other in carrying on the combination to completion in producing the useful result, the object of the inventions, that they must be employed together in the specified sequence, and as a unitary process, or substantially so in co-ordinating the processes, to make the final superior completed product known as plaster or wallboard.

Important as many of these claims are in both the process and apparatus patents, they do not, any of them alone, produce plaster board of the quality or character produced by plaintiffs, nor, indeed, can a less number of them do so as efficiently and economically as the entire process operating co-operatively with all its elements in use, or, to state the relation in a different way: The two process patents, with their combinations, are so interstitially related that the elimination of one would very seriously impair the whole as an efficient and economical operating process.

### Patent No. 1,176,322.

Returning, now, to plaintiffs' first process, patent No. 1,176,322, dated March 21, 1916, for "a new and useful process of making plaster board and the like," we find described in detail in the specification and accompanying drawings the processes employed and the apparatus used by plaintiffs in making plaster board and the like according to their invention. Referring to the prior art, the plaintiffs say:

"As is well known, such plaster board is usually formed by applying to a strip or sheet of paper or paper board a coating of suitable plastic material, which may be of any desired composition, and include as its ingredients plaster, cement, or compositions of the same, including finely divided materials of various sorts. To a strip or sheet of board so treated or coated a further strip or sheet is then applied, and, when the plastic substance has become set, the two boards and the plastic substance have become adhered and constitute generally the plaster board product."

It will be seen later that this is a fair statement of the prior art. The plaintiffs then describe the general character of their improved process for making plaster board.

"In accordance with the present invention," state the inventors, "the paper is fed in strips or sheets, and the plastic substance is interposed between the same, in a continuous supply, the two strips of paper or paper stock being fed, or gaged or governed in the feed, so as to properly space the same and provide for the reception between them of a plastic substance. Furthermore, this paper or paper stock is preferably so treated or impregnated with such proper substance or substances, that its permeation by the liquid or semi-liquid plastic substance is retarded, and the soaking or saturation of such strips or sheets by the plastic substance is delayed, permitting the severed portions of the united strips with the plastic material between the same to be handled by stacking or piling the same for further handling or subdivision prior to the setting or drying or hardening of the plastic substance. When this has occurred, the units of the product may be readily handled for such further treatment or subdivision as is desired."

The result accomplished by this continuous and improved process of treating the paper stock is then set forth:

"It results that such continuous process may be carried on, and the product conveniently and effectively handled in large quantities, and the severed

units of the product consisting of the sheets with the plastic substance interposed may be readily passed over one another to stack the same, which would not be possible or as readily possible if the paper stock or paper was readily permeable to the moisture of the plastic substance."

Further result accomplished by the process, in the gradual distribution of moisture drawn from the plastic substance:

"Furthermore this retardation of the soaking or permeation of the paper by the stock causes a gradual distribution of moisture through the paper stock and a gradual expansion of it due to taking up such moisture without tearing or splitting the paper."

The advantage of retarded action in the absorption of moisture from the plastic substance stated:

"The units would likewise tend to curl or roll under such quick absorbing action, whereas a retarded action of this nature prevents such absorption."

Further advantages stated and explained in the intitial drying process:

"The units having thus been soaked or permeated with moisture uniformly, and having become fully expanded, it results that after the plastic substance has become set and the units become dried out, the product, having thus become stretched or expanded to its limit, will not further stretch or expand or warp or curl should moisture be applied to the same after it has been applied to the wall or walls or put in place."

A further advantage of retarded absorption of moisture by the sheets or strips is stated:

"This retardation of the absorbing action in the sheets or strips likewise permits the units to be handled in stacks prior to the setting or drying action, without tearing or splitting, which would occur if a rapid permeation of the paper sheets took place."

The conveyor and its uses:

"After the units described have become hardened or set, they are picked up and placed upon a suitable conveyor, being retained upon the same tray upon which they were first stacked in the initial drying process, it being understood that the units are now set, although certain slight moisture remains, which is removed by the dry kiln process, as hereinafter recited."

The trimming of the plaster boards and the cutting of the same into proper finished lengths is then provided for:

"Upon this conveyor, which may be a car or carrier of any suitable type, the units are first trimmed longitudinally at their side edges, smoothly and uniformly, and the carrier is then advanced to a station at which the units are trimmed transversely at their ends and likewise severed transversely into proper finished lengths."

The plaster boards are then placed on their side edges:

"The several resultant groups or stacks of units are then angled up, so as to stand upon their side edges, together with the original tray upon which they first rested."

The vertically disposed stacks are then placed upon a separate carrier and moved to the drying kiln—

"and each of such stacks with the units vertically disposed is then placed upon a separate carrier or car, the units being suitably spaced apart so that com-

plete drying is facilitated, and such complete drying is performed in a suitable dry kiln into which the particular stack is trundled."

After the completion of these successive co-ordinating and unitary processes, the plaster board is finished and ready for the market:

"After such drying the product is entirely finished, and the separate finished units are sent to market."

The specification for this patent describes the drawings of the apparatus for carrying forward this process in a sequence of mechanical steps, but without limiting the process to the particular means or apparatus described in the drawings. These drawings show in detail what may be stated generally as apparatus, with grouping or assemblage of essential features for carrying out the process in successive coordinating steps, more specifically the operation of the process.

These drawings are full in detail, and include, among other mechanical devices: Means for mixing and supplying the mortar, or plaster, described as a plastic substance; a water supply pipe above the mixing trough; a device for regulating and controlling the flow of the plastic substance; paper rolls rotatably mounted one above the other for supplying paper in two strips, between which strips of paper the plastic substance, with the paper, is drawn under a roller and compressed in an even layer to the desired thickness and carried forward by an apparatus designated as advancing means, commonly described as a conveyor, with an endless belt operated with rollers and by driving means; a cutting apparatus for severing the plaster boards into desirable lengths; trays at the discharge end of the conveyor for receiving the severed portions of the plaster boards, the still flexible and soft plaster boards being allowed to set or harden on such trays; a car adapted to run on a suitable track and provided with vertical spacing stakes, which serve to hold the plaster board layers in a vertical position; a drying kiln of standard construction, into which the car with the plaster boards is moved for the completion of the drying process. At this point the process is completed, and the finished product discharged.

The next and most important feature of the patent—indeed, its most vital part—is the invention described in the claims. These claims are particularly important in this case, where the District Court, in its interlocutory decree, has held this patent void in law as to claims 1 to 7, being devoid of invention, and that claims 8 and 9 have been anticipated and are therefore void. For convenience of reference, we separate claim 1 into clauses, and the additions of elements in the succeeding claims are referred to the appropriate clause in claim 1 to which the element is added in intimate relation.

*Claim 1.*—The elements of the process of making plaster board and the like, disclosed in this claim, are: (1) Consisting in feeding and advancing strips of suitable material; (2) supplying moist unstable plastic substance between the same; (3) causing the uniform distribution of the plastic substance between the sheets to a predetermined thickness of layer; (4) subdividing the sheets with the interposed plastic substance into first lengths; (5) in which form they are dried and caused to harden or set; (6) trimming of the same at the edges; (7) reducing the same to final lengths; (8) and finally drying the same.

*Claim 2.*—The elements of the process disclosed in this claim are the same as in claim 1, with the addition to clause 8, "and finally drying the same," the words "in spaced positions."

*Claim 3.*—The elements of the process disclosed in this claim are the same as in claim 1, with the insertion in clause 5, after the words "in which form they are dried," the words "in superposed relation," retaining the remainder of the clause, "and caused to harden or set."

*Claim 4.*—The elements of the process disclosed in this claim are the same as claim 1, with the addition to clauses 5 and 8 of the words we have added for claims 2 and 3.

*Claim 5.*—The elements of the process disclosed in this claim are the same as in claim 1, with the addition to clause 1 of the words "treated to retard permeation by moisture."

*Claim 6.*—The elements of the process disclosed in this claim are the same as in claim 1, with the addition to clause 1 of the words "treated to retard permeation by moisture"; in clause 4, "subdividing the sheets with the interposed plastic substance into suitable lengths," instead of "first" lengths; and in lieu of the remaining clauses of claim 1 a new clause is inserted, "(5) and stacking the same in superficial contact."

*Claim 7.*—The elements of the process disclosed in this claim are substantially the clauses of claim 1, with the additions to other claims heretofore noted; with the omission in clause 2 of the words "between the same," and the substitution of the words "upon the strip"; with the additional element, as clause 3, "advancing the strip and the plastic substance thereon to unite the same with another strip treated to retard permeation by moisture"; and omitting clauses 5, 6, 7, and 8 in claim 1.

The remaining claims cannot be conveniently referred to claim one. The clauses are as follows:

*Claim 8.*—The herein disclosed process of making plaster board and the like: (1) Consisting in uniting with a sheet of paper or the like in superficial contact therewith; (2) said sheet of paper or the like being treated to retard permeation by moisture; (3) a moist unstable plastic substance and under pressure; (4) gradually hardening the plastic substance during the retarded permeation of the paper or the like by the moisture of the plastic substance; (5) and finally dry-finishing the same.

*Claim 9.*—The herein described process of making plaster board and the like: (1) Consisting in uniting with two sheets of paper or the like in superficial contact therewith; (2) said sheets of paper or the like being treated to retard permeation by moisture; (3) a moist unstable plastic substance interposed between such sheets of paper or the like and under pressure; (4) gradually hardening the plastic substance during the retarded permeation of the paper or the like by the moisture of the plastic substance; (5) and finally dry-finishing the same.

In Walker on Patents (5th Ed.) § 176, p. 221, the author states the law with respect to such claims—separate and in combination—to be:

"A claim may cover the entire process, machine, manufacture, or composition of matter, which is set forth in the description, or it may cover such parts, or

such subprocesses, or such combinations, as are new and useful inventions, and the specification may contain a claim for the whole, and other claims for separate parts, and still other claims for separate subprocesses or combinations. And the subject of a claim needs not to be operative alone, for utility is justly ascribed to things which have their use in co-operating with other things to perform a useful work. But in order to be sustained, each claim must be able to withstand the tests of invention, of novelty, and of utility. * * *"—citing authorities.

The processes enumerated in the foregoing claims are carried out in intimate combination in one continuous process by the apparatus described in the drawings. This apparatus is about 40 feet in length, with an appropriate width, producing by the plaintiffs' process, if required, a plaster board of a size 8 feet in length, 4 feet in width, and three-eighths of an inch in thickness, or of greater dimensions, or of final lengths of less dimensions, by the severing process and apparatus described in patent No. 1,197,553. The plaintiffs designate the longer board as wallboard, to distinguish it from the plaster board of the present and prior art, of about 32 inches in width, and 36 inches in length, and three-eighths of an inch in thickness, which is used only as a wooden or metallic lath to be plastered over, and not as a finished wall, for which plaintiffs' wallboard is made by the process.

What is a process in the patent law? In Cochrane v. Deener, 94 U. S. 780, 788 (24 L. Ed. 139), Mr. Justice Bradley said:

"A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable, whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence."

In Tilghman v. Proctor, 102 U. S. 707, 728 (26 L. Ed. 279), the same learned Justice tersely said:

"A machine is a thing. A process is an act, or a mode of acting. The one is visible to the eye—an object of perpetual observation. The other is a conception of the mind, seen only by its effects when being executed or performed. Either may be the means of producing a useful result. The mixing of certain substances together, or the heating of a substance to a certain temperature, is a process. If the mode of doing it, or the apparatus in or by which it may be done, is sufficiently obvious to suggest itself to a person skilled in the particular art, it is enough, in the patent, to point out the process to be performed, without giving supererogatory directions as to the apparatus or method to be employed. If the mode of applying the process is not obvious, then a description of a particular mode by which it may be applied is sufficient. There is, then, a description of the process and of one practical mode in which it may be applied. Perhaps the process is susceptible of being applied in many modes and by the use of many forms of apparatus. The inventor is not bound to describe them all, in order to secure to himself the exclusive right to the process, if he is really its inventor or discoverer. But he must describe some particular mode, or some apparatus, by which the process can be applied with at least some beneficial result, in order to show that it is capable of being exhibited and performed in actual experience."

In Expanded Metal Co. v. Bradford, 214 U. S. 366, 385, 29 Sup. Ct. 652, 657 (53 L. Ed. 1034), Mr. Justice Day reviews the decisions of the court upon this question, and reaches—

"the conclusion that an invention or discovery of a process or method involving mechanical operations, and producing a new and useful result, may be within the protection of the federal statute, and entitle the inventor to a patent for his discovery."

[1, 2] The making of plaster board for interior wall finish or other like building purpose is unquestionably an art of great utility, and the art of combining all the elements entering into a high quality of plaster board structure of size, strength, and durability, which can only be accomplished by an intimate knowledge of the nicely balanced relation of each to the other, and the making of such combination effectively and economically at timely successive stages within the time setting period of the plaster material, may display invention of a high order. Have the plaintiffs, in their process of making plaster board, displayed such invention? The expert examiners of the Patent Office say they have, and a patent was issued to plaintiffs on such examination. The patent itself is prima facie evidence that the patentee was the first inventor. At least it casts upon him who denies it the burden of sustaining his denial by proof beyond a reasonable doubt. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 498, 23 L. Ed. 952; San Francisco Cornice Co. v. Beyrle, 195 Fed. 516, 518, 115 C. C. A. 426; Consolidated Contract Co. v. Hassam Paving Co., 227 Fed. 436, 440, 142 C. C. A. 132; Los Angeles Lime Co. v. Nye (C. C. A.) 270 Fed. 155, 163; Selectasine Patents Co. v. Prest-O-Graph Co. (D. C.) 267 Fed. 840, 843.

In an amendment to defendant's answer, filed September 13, 1920, the alternative defense was set up that each of the letters patent, No. 1,176,322 and No. 1,176,860, were void, because the description and specifications of each of said patents was not so full, clear, concise, and exact as to enable any person skilled in the art to make, construct, compound, or use the same, in that the feature of the use of paper or other or like material of retarded moisture absorbent quality is made an essential feature of the alleged processes of each of said letters patent, and in that the patentees did not state any specific method of treating paper or other or like material for giving it a quality of retarding absorption of moisture, nor did they identify any particular kind of paper or other or like material having such qualities.

The defendant here refers to the element mentioned in claims 5, 6, 7, 8, and 9 of patent No. 1,176,322, specifying strips of paper "treated to retard permeation by moisture," and to the specification, contained in patent No. 1,176,860, that:

"The paper or paper stock used will preferably have been so treated or impregnated with such proper substance or substances, previously to the formation of the plaster board sheets, that the saturation of the paper by moisture from the plastic substance is delayed."

In the further amendment to its answer, the defendant alleged:

"That the process set forth in said patent No. 1,176,860 (held valid by the decree) was the same, or substantially the same, as the process set forth in said letters patent No. 1,176,322 (held void by the decree for lack of invention),

which latter mentioned patent was issued at a date earlier than said first-mentioned patent, in that the claims of said two letters patent are directed substantially to one and the same alleged process, and in that there is no clear, logical, or reasonable line of division between the said two letters patent."

The plaintiffs concede the truth of the last-mentioned amendment, with the qualification that the later invention is an improvement on the first; and in view of this agreement of the parties and the evidence in the case supporting this view, plaintiffs do not understand, and neither do we, how the District Court could have held patent No. 1,-176,860 valid, and patent No. 1,176,322 invalid, for lack of invention.

[3] With respect to the remaining objection, that there was an insufficient disclosure of the use of paper or other like material for retarding the absorption of moisture, the question was one of fact. In Walker on Patents, § 454, the author says:

"Whether a given patent does so fall [below the statutory requirement as to description] is a question of evidence and not of construction"—citing Loom v. Higgins, 105 U. S. 580, 26 L. Ed. 1177, where the question is so treated.

[4] The District Court, in its memorandum of opinion (but not in its decree), found that the patent No. 1,176,322 did not make a sufficient disclosure concerning these claims of the patent. It appears from the evidence that paper, in its manufacture for certain purposes, is sized to make it water-retarding, and the degree of sizing is made to meet the requirements of the purchaser. The Schumachers did not patent the sizing process. What they did was to incorporate into their process the use of properly sized paper, which could be purchased in the open paper market.

Bruce F. Brown, a paper mill superintendent, called as a witness by the defendant, but afterwards by the plaintiffs, conceded by both sides of the controversy, as well as by the court, to be duly qualified and fair and unbiased, testified:

That "hardsize" paper "means the percentage of rosin sizing that is put into the sheet to make it water resistant." "We make it [the paper] in different layers with different degrees of sizing."

The witness was asked:

"If a person ordering paper specified that the moisture should come through surely inside of 10 minutes, would you be able to comply with that specification in the ordinary course of paper making?"

The witness answered:

"In paper board making, I would say yes."

The witness was asked:

"Q. You don't know any specific invention or discovery which has tended to standardize or permit a more definite predetermination as to permeation periods, as having occurred since 1912, do you? A. I do not.

"Q. There has been no discovery or invention that you know of that has tended to more closely standardize periods of permeation of paper by moisture since the year 1912? A. Not that I know of.

"Q. As a matter of fact, your company, and you acting for your company (the Southern Board & Paper Mills), had sold and supplied paper to the Messrs. Schumacher for wall board manufacture, at Los Angeles, Cal., prior to the time that you first met Mr. Sexton (the buttonlath inventor); isn't that correct? A. Yes, sir."

It appears further, from the evidence, that the defendant buys from the same paper manufacturer, the same kind of paper, and for the same purpose that the plaintiffs buy the paper for their process; that the first order for this character of paper came from the plaintiffs June 12, 1914, and the first order from the defendant September 21, 1914. The plaintiffs contend that this testimony is not only evidence of the sufficiency of the disclosure of plaintiffs' claims, with respect to the paper suitable for the process, but is strong evidence of the defendant's infringement of that process.

We find no evidence in the record even tending to show that the disclosures were not sufficient to enable any person skilled in the art to make, construct, compound, or use the same. No one testifying in the case stated that there was any ambiguity, indefiniteness, or uncertainty in the meaning of any claim, or of any part of the specifications or drawings of these process patents. Certain it is the disclosure was sufficient to enable the defendant to procure in the paper market the required quality of paper and follow plaintiffs' process in other respects.

The decree makes no specific finding upon this question, but finds that claims 5, 6, and 7 of patent No. 1,176,322 (first process patent), in which this feature of the invention was incorporated and was the dominant feature of such claims, were void for want of invention, and that claims 8 and 9 of the patent, containing the same element, had been anticipated and were void. In the same decree the court found that patent No. 1,176,860 (second process patent) was good and valid in law, although neither the specification, drawings, nor claims of that patent made any further disclosure concerning that element, and this finding is now an established fact in the case. Treating the court's opinion as a finding that patent No. 1,176,322 (first process patent) did not make sufficient disclosure concerning this feature of the claims, and such finding a finding of fact, we must hold that the finding is not supported by the evidence, and is in conflict with the finding with respect to patent No. 1,176,860 (second process patent).

[5] The decree adjudged claims 1 to 7 as being devoid of invention. This is also a finding of fact. Walker on Patents (5th Ed.) § 23; Proudfit Loose Leaf Co. v. Kalamazoo Loose Leaf Binder Co., 230 Fed. 120, 127, 144 C. C. A. 418; Herman v. Youngstown Car Mfg. Co., 191 Fed. 579, 582, 112 C. C. A. 185; Ferro Concrete Const. Co. v. Concrete Steel Co., 206 Fed. 666, 668, 124 C. C. A. 466.

The claims of the patent are supported by the rule of law stated in Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952, and Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939, and restated in Cantrell v. Wallick, 117 U. S. 689, 695, 6 Sup. Ct. 970, 973 (29 L. Ed. 1017), holding that:

"The burden of proof is upon the defendants to establish this defense. For the grant of letters patent is prima facie evidence that the patentee is the first inventor of the device described in the letters patent and of its novelty."

The court says further:

"Not only is the burden of proof to make good this defense upon the party setting it up, but it has been held that 'every reasonable doubt should be re-

solved against him' "—citing Coffin v. Ogden, 18 Wall. 120, 124, 21 L. Ed. 821; Washburn v. Gould, 3 Story, 122, 142, Fed. Cas. No. 17,214.

This rule has been followed in this circuit. San Francisco Cornice Co. v. Beyrle, 195 Fed. 516, 518, 115 C. C. A. 426; Consolidated Contract Co. v. Hassam Paving Co., 227 Fed. 436, 440, 142 C. C. A. 132.

[6] Defendant contends further that the specification and claims do not make a sufficient disclosure of the process to enable any one skilled in the art or science to which the process relates to practice the same and produce the results described in the patent without resorting to experiments, trials, or tests. R. S. § 4888 (U. S. Comp. Stat. § 9432). This objection is based upon the variation of the treatment required in dealing with and combining the different materials used in the process described in the patent; for example, strips of paper treated to retard permeation by moisture, applied to the plastic material of plaster, cement, or compositions of the same, interposed between such sheets, and the absorbing or drying period of each, which must be timed to certain stages of the process.

It is contended that no one can tell, except by independent experiment, how to conduct the claimed processes so as to have them successfully co-ordinate and co-operate together, to produce the useful result required by the statute. This scope of experimental requirement, it is contended by the defendants, is beyond the disclosures of the specification and claims, and render such disclosures insufficient.

This objection has been brought to the attention of the appellate courts of the United States in a number of cases, particularly in Mowry v. Whitney, 14 Wall. 620, 643, 20 L. Ed. 860; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 436, 437, 22 Sup. Ct. 698, 46 L. Ed. 968; Minerals Separation v. Hyde, 242 U. S. 261, 270, 37 Sup. Ct. 82, 61 L. Ed. 286; Minerals Separation v. Butte Min. Co., 250 U. S. 336, 341, 39 Sup. Ct. 496, 63 L. Ed. 1019; and Snow et al. v. Kellar-Thomason Co. in this Court, 241 Fed. 119, 120, 154 C. C. A. 119.

These cases involve processes in which something had been left by the specification and claims to the skill of persons applying the processes. In the last two Supreme Court cases, the process related to the concentration of ores by process of oil flotation. By reason of the varied character of the ores to be treated, preliminary tests were required by the user to determine the amount of oil and the extent of agitation necessary in order to obtain the best results from the different ores. Speaking of this feature of the process and the alleged uncertainty of the specification and claims as to the amount of oil to be used in the application of the invention, the court said:

"Untenable is the claim that the patent is invalid for the reason that the evidence shows that when different ores are treated preliminary tests must be made to determine the amount of oil and the extent of agitation necessary in order to obtain the best results. Such variation of treatment must be within the scope of the claims, and the certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter. The composition of ores varies infinitely, each one presenting its special problem, and it is obviously impossible to specify in a patent the precise treatment which would be most successful and economical in each case. The process is one for dealing with a large class of substances, and the range of treatment

within the terms of the claims, while leaving something to the skill of persons applying the invention, is clearly sufficiently definite to guide those skilled in the art to its successful application, as the evidence abundantly shows. This satisfies the law."

To this last expression the Supreme Court added, in Diamond Rubber Co. v. Consol. Tire Co., 220 U. S. 428, 436, 31 Sup. Ct. 444, 448 (55 L. Ed. 527):

" * * * Which only requires as a condition of its protection that the world be given something new and that the world be taught how to use it. It is no concern of the world whether the principle upon which the new construction acts be obvious or obscure, so that it inheres in the new construction."

The Supreme Court, in Loom Co. v. Higgins, 105 U. S. 580, 586, (26 L. Ed. 1177), referring to the judicial method of acquiring a knowledge of the elements of an invention and its relation to the prior art, said:

" * * * If we follow the specification in its description of the invention in detail, with the references to the drawings, and the closing summary of the patentee's claims, the same method of interpretation will be applicable. And as it cannot be expected that the court will possess the requisite knowledge for this purpose, it becomes necessary that it should avail itself of the light furnished by the evidence to enable it to understand the terms used in the patent and the devices and operations described or alluded to therein. This evidence, of which the record in this case furnishes an abundance, being resorted to, we have no difficulty in comprehending the patent, or the nature of the invention therein described."

We have pursued that method in this case, to acquire the knowledge, if possible, of one skilled in the art, and while we have found the processes technical, and the elements closely compacted and delicately related, we have found no insuperable difficulty in comprehending the terms of the patent, its drawings, specification, and claims, and its disclosures of the processes therein described, and we draw the obvious conclusion that the expert, or one skilled in the art by experience, following such disclosures, would have no greater difficulty in making, constructing, and using the process and the mechanism devised for carrying it into operation.

[7] The next objection to patent No. 1,176,322 is the claim of the defendant that the process under the patent was placed on sale by the plaintiffs in this country more than two years before plaintiffs made application for the patent and that the same was abandoned. The objection is made under sections 4886 and 4920 of the Revised Statutes. Section 4886, Revised Statutes (section 9430, Compiled Statutes), provides:

"Any person who has invented or discovered any new and useful art [process], * * * not in public use or on sale in this country for more than two years prior to his application, unless the same is proved to have been abandoned, may * * * obtain a patent therefor."

Section 4920, Revised Statutes (section 9466, Compiled Statutes), provides:

"In any action for infringement the defendant may plead the general issue, and, having given notice in writing to the plaintiff or his attorney thirty days

before, may prove on trial any one or more of the following special matters:

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"Fifth. That it [the invention] had been in public use or on sale in this country for more than two years before his application for a patent. \* \* \*"

The defendant did not give the notice of the special matter in defense required by section 4920 of the Revised Statutes. In lieu thereof, the defendant relies upon the issues raised by the complaint and answer, and the answers of Joseph E. Schumacher, one of the plaintiffs, to certain questions upon cross-examination. In the complaint the plaintiffs alleged that they were—

"the original, first, and joint inventors of a new and useful process of making plaster board and the like, \* \* \* not in public use or on sale in the United States for more than two years prior to said application for letters patent therefore and not abandoned."

In defendant's answer, it denies:

"That said alleged invention was not in public use or on sale in the United States for more than two years prior to the complainants' said application for United States letters patent thereon."

[8] The defendant does not deny in its answer that the invention was "not abandoned." That allegation of the complaint, therefore, stands admitted, and as no notice was given under the statute that either a prior sale or abandonment were relied on as defenses, they might well be treated as not in issue in the case. But as the defense of sale of the process more than two years prior to the application for the patent is upon the same evidence relied on to establish abandonment, namely, the answers of Joseph E. Schumacher, one of the plaintiffs, to certain questions upon cross-examination, we will pass the question involved in the procedure, without intimating a waiver of such procedure, and dispose of the questions at issue on the merits. Section 269, Judicial Code, as amended by Act of February 26, 1919, 40 Stats. 1181 (Comp. St. Ann. Supp. 1919, § 1246).

Plaintiffs' application for patent No. 1,176,322 was filed in the Patent Office April 23, 1915. Two years before that date was April 23, 1913. Defendant did not seek to prove by any of its own witnesses that the process had been on sale or had been abandoned prior to April 23, 1913. But it appears in the defendant's amended answer that it denied the plaintiffs were the original and true inventors of the improvements described in patents Nos. 1,176,322 and 1,176,860; that said improvements were originated and invented by, among others, one James P. Sexton. This obscure reference was identified by the evidence as relating to patent No. 1,115,593, issued to James P. Sexton on November 3, 1914, reissued June 6, 1915, as reissue patent No. 14,148, for a plaster lath, referred to in the proceeding as a buttonlath.

The manufacture of this product has, by assignments, become vested in the defendant. It is distinctly a product, and not a process; but the process of its manufacture has been brought into this controversy as an anticipation of plaintiffs' process. The Sexton application for this buttonlath patent was filed in the Patent Office on October 28, 1913, or about one year and five months prior to the filing of the Schumacher application for the plaster board process.

Sexton, as a witness called by the defendant, testified to his experiments in making plaster board and buttonlath, commencing in 1908 and continuing at intervals down to the time he applied for the patent for his buttonlath product described in his patent. His first experiment appears to have been made in a boxlike structure, about 6 inches wide and probably 12 inches long. After that he made the full-sized sheets on a table. The sheets were 24 inches by 32 inches long. The witness testified that the first paper he used was a chip board that came from the laundry in the bosom of laundered shirts, which had great affinity for water and became wet very quickly. He also testified that he got paper from the Pioneer Paper Company that was satisfactory, but it was too expensive. It had a coating on each side of it, a Manila coating, as they called it, which made it very expensive. He did not continue the use of this paper in the later experiments.

The first paper treated to retard permeation by moisture was purchased by Sexton from Bruce F. Brown on September 21, 1914. The Schumachers had purchased the same kind of paper for their process from Brown on June 12, 1914. Brown was the superintendent of the Southern Board & Paper Mills. To fix the date of the Schumacher invention as having been made prior to the Sexton application for his buttonlath patent, filed October 28, 1913, the plaintiffs called J. E. Schumacher in rebuttal, who testified to his experiences, commencing in the fall of 1908, in the making of plaster board or plaster covering for slabs to take the place of lath and plaster.

In the month of April, 1912, Schumachers decided upon making a board having two sheets of paper and a composition core, using building material paper. The first experience was with a small sample, about 12 by 18 inches. A machine or apparatus was devised for making this board, which was completed in October, 1912. A table was constructed and plaster boards made on it. These boards were 32 inches wide by 10 feet in length, and were used by the plaintiffs, being built into the partition at the factory. This was in February, 1913. They commenced to turn out board at the plant in May, 1913. The paper for this product was purchased from Zellerbach just prior to that time. Plaintiffs sold the first plaster board on August 16, 1913, to the Crescent Supply Company.

On cross-examination the witness testified that the first piece of plaster board they ever made, using plaster and sawdust between two sheets of paper, was on a table in May, 1912. An apparatus was later designed by John Schumacher and set up in a shed in the rear of the house. The first person called in to see the plaster board was a Mr. Larson, a neighbor, who wanted to show it to somebody. He called some time between November and the first of the year (November, 1913, and the first of the year 1914). The next visitors to the house were a Mr. Montgomery, a Mr. Mullin, and a Mr. Griffith. This was about November 9, 1913. They came to see the board and the samples. They wanted to see the process, but the Schumachers would not show it to them. The witness was asked:

"You would not show it, even to a proposed investor? A. No."

There was some suggestion by Montgomery and Mullin that capital be put back of the invention, but it was not shown that the Schumachers made any proposition in that respect. It was not shown that there was any meeting of minds between the Schumachers and any one else dealing with the invention, nor was there any arrangement entered into, either tentatively or otherwise, concerning an enterprise based upon the invention; nor was it shown what sort of a suggestion was made by any one in this respect. The Schumachers did not, in fact, explain the process to any one of the visitors who came to the house to see the product. None of the visitors knew what the Schumachers had, excepting that they were shown some pieces of plaster board, but no proposal was made with any one to take up the manufacture of the board. The process was not explained or offered for sale. The Schumachers proceeded to perfect the manufacture of the board themselves, without the assistance of any one.

We conclude from the evidence that neither the invention, the product, nor the process was placed on sale, or offered for sale to any one, before or within the statutory period of two years prior to plaintiffs' application for their patent, nor is there any evidence of such a sale of the invention or process since.

It is next contended that the Sexton patent, No. 1,115,593, was an anticipation of plaintiffs' invention, as described in patents No. 1,-176,322 and No. 1,176,860. But as the decree adjudges patent No. 1,176,860 valid and infringed, and only claims 8 and 9 of patent No. 1,176,322 void for anticipation, we are only required to determine the question of anticipation with respect to those two claims. Anticipation with respect to the other seven claims of that patent and anticipation with respect to the claims of patents No. 1,259,049 and No. 1,-286,801 are not involved in this appeal.

We have already mentioned the fact that the Sexton patent is distinctly for a product, and not a process. But as it is charged that the process of its manufacture anticipated claims 8 and 9 of the Schumacher process, we must consider that aspect of this defense. The omission of Sexton to secure a patent for his process does not remove it from the case as an alleged process; but we must bear in mind that defendant did not, in the Patent Office or elsewhere, claim his process as an invention. He claimed buttonlath as an invented product only, but made no claim for an invented process in its manufacture.

It is specified in the application for this patent by Sexton that the invention relates to a plaster or mortar lath, which is adapted to be used as a base or foundation for the finished plaster coat on walls and ceilings of buildings, and the main object of the invention is to provide for securely locking or keying the finished plaster coat to the plaster base. The process of making this plaster base, or buttonlath, under the patent, stated briefly, is substantially the use of mortar, or plaster, of the required thickness, in such manner that it will take on its smoothed surface a suitable paper or chip board, having perforations through which the moist mortar or plaster will project, forming, when set, buttons or heads which, flaring outwardly from the perforations, form keys for the retention of the finishing plaster coat to be placed on this base.

The paper or chip board may be corrugated to increase the binding quality of the buttons, and cords or wires may be used extending transversely through the corrugations as a reinforcement of the plaster base. The essential element of the patent is clearly the binding quality of the plaster buttons perforating the paper and keying the whole into a board of plaster. By placing two of the above-described plaster bases back to back, or by doubling over the plaster base so as to form a double face member, the invention may be used for forming walls capable of being used for partitions and the like, and adapted to receive plaster coating for each side.

In practice, the plaster, or buttonlath, is made in sheets about three-eighths of an inch in thickness, 24 inches to 32 inches in width, and 36 inches in length. The buttonlath sheets, when completed, may be used in building construction in lieu of the wooden or metal lath upon which plaster is placed and set. The sheets of buttonlath are secured in position on the wall of the building in any suitable manner, for example, by the use of nails driven through the plaster board or lath, into the timbers in the building, in substantially the same manner that the wooden or metal lath is fixed to the wall.

The buttons in one form are spaced on the base in stagger relation to each other, about 1½ inches apart, giving the base an effective grip on the finish coat. It is plain from this brief description of buttonlath as a product that the process of its manufacture is very different from the plaintiffs' process, producing a different product, in which the essential element is the mechanical keying system or binding quality giving the product the appropriate name of buttonlath.

It is claimed by the defendant that in the manufacture of this product the processes of claims 8 and 9 of plaintiffs' inventions were anticipated. We do not think the evidence establishes the priority of defendant's process in making buttonlath in any aspect of plaintiffs' patent; but the plaintiffs, on the other hand, claim that defendant has, in practice, added to its process for the manufacture of buttonlath, as stated in the Sexton patent, and in practice uses certain elements in the process of the manufacture of buttonlath and Peters wallboard not found or claimed in the Sexton patent, and that the same is an infringement of plaintiffs' patents.

It appears that, by this practice of the defendant, buttonlath is manufactured upon a longitudinal belt, or conveyor, several hundred feet in length. At the initial point, the paper for the upper and lower surfaces is fed over rollers between which the plaster is interposed in a continuous supply, the rollers pressing the plaster to a uniform thickness, and the continuous strip thus constituted, with its layer of plaster and paper above and below, advances by a uniform motion down the whole length of the conveyor. As the strip advances, the plaster hardens, or sets, and the absorption of moisture from the plaster into the paper layers progresses, and the union between the paper and plaster takes place, so that at the far end of the conveyor the product has become stiff, and the desired lengths can be, and are, cut off and handled separately.

The separate lengths of buttonlath are carried automatically on another conveyor, and automatically deposited in separate layers in a kiln

car, in which car they are taken into the drying kiln and dried out. Buttonlath by this practice is manufactured by what is termed the long belt method, and in this particular the process is distinguished from the short apparatus employed by the Schumachers in their process. But the defendant also uses the short belt method, and admits the use of certain steps of plaintiffs' process. Defendant's process, as carried on under the buttonlath patent, is a different process and is not an anticipation, whatever may be the fact concerning the priority of its production, or the later adoption of elements of plaintiffs' process in making buttonlath.

The defendant set up in its amended answer five other patents as anticipations to plaintiffs' patents. The first of these is patent No. 867,202, issued to David H. Kendall, September 24, 1907, for a process of making stiffening for sunbonnets and the like. The invention relates to a mixture of certain ingredients as a paste, the application of the paste to two or more thicknesses of muslin or other suitable cloth, and the subjecting of the product to a treatment whereby it is rendered pliable and otherwise suited as stiffenings for sunbonnets, sun hats, coats, and coat lapels, wearing apparel, and the like. The patent has five claims, all relating to the process of making a stiffening, consisting of paste, pasting together a number of layers of cloth of muslin quality with a paste made of flour and water and alum, and drying same. The other details of the claims are not essential elements in the determination of the question under consideration. We do not think it necessary to point out the obvious differences between plaintiffs' process and this process for making stiffening for sunbonnets and the like.

The next patent set up in anticipation is patent No. 401,967, issued to Alfred J. Paris, April 23, 1889, for fireproof plaster cloths for ceilings and walls. The invention is claimed as an improvement on an application previously made by the applicant relating to fireproof plaster cloth molded in sections in which the plaster is completely inclosed within burlap, or other fibrous material, except such portion as oozes through said burlap and thus helps to protect the cloth which incloses the plaster. The patent has five claims, containing some further details relating to the product, but nothing important in the essential elements of the process of making the product.

The next patent set up as an anticipation is patent No. 468,355, issued to George F. Mayhew, February 9, 1892, for an improved composition material made up of sheets or pieces of straw or other pulpy board and strips or slats of wood interposed and secured together and between said sheets by an adhesive compound, which, when dry, forms a hard, inflexible, and inelastic connection between the parts, whereby a stiff and durable composite board is produced. In a method of manufacturing this material, it is subjected to heavy pressure and to a drying process, and to make it waterproof a compound composed of clay, pitch, and dextrine is commonly employed. It may also be made waterproof by soaking it thoroughly in oil, the paper in each case being thoroughly dry before used in the manufacture of the board. The patent has sixteen claims.

The next patent cited as an anticipation is patent No. 520,123, issued May 22, 1894, to Augustine Sackett, for improvements in inside

wall coverings. The object of the invention is stated to be to provide boards, or planks, which may be used as a substitute for lath and plaster as material for forming the inner walls of houses or rooms. The plaster is spread in a thin layer upon a sheet of paper. A second sheet of paper is laid upon the first. A second layer is spread upon it, and so on, until as many layers have been superposed as are necessary to produce a board of the required thickness. The layers should be spread, says the inventor, as rapidly as possible, in order that the plaster shall not set, and, when the required number have been superposed, the plate or board should be placed between flat surfaces and subjected to pressure, in order that it may dry in a perfectly flat condition. Several boards or plates may be superposed, being separated by intervening sheets of paper and subjected simultaneously to pressure in a suitable press. The boards should be held flat until they are dry, or at least until the plaster has fully set. Preferably a sheet of water proof paper is placed on one side of the board, which is best done in the process of manufacturing the board, although the waterproof paper can be applied subsequently, or one side of the board might be waterproofed by applying to it a waterproof varnish, paint, or composition. The inventor states that he prefers waterproof paper which has been prepared by being coated with some bituminous substance, such as coal tar pitch. In applying the boards, the waterproof sides should be placed towards the outside of the house, so as to bring the absorbent side of the board to the inner side of the wall. The patent has three claims, in which the method of making the board is set out as herein stated.

The next patent cited in anticipation is patent No. 905,191, issued to Stephen J. Kelly, December 1, 1908, for an improvement in plaster boards. The object of the invention is stated to be to provide a plaster board which shall be capable of resisting bending strain to a considerable degree, substantially proof against the material separation of its constituent members or the disintegration of its plaster portion, adapted to retain its original condition intact in the vicinity of holes punched in it by securing nails or the like, and proof, not only against the disintegrating influences of moisture, but against its transmission therethrough.

In the manufacture of this plaster board it is stated that the manufacturer cuts heavy fibrous material, such as strawboard, cardboard, or the like, of the kind used in manufacturing heavy pasteboard boxes, or heavy mailing tubes, into sheets of suitable size. A plaster compound is then prepared, say from plaster of paris or the like, and water, hair, wood, wood fiber, or other fiber filaments are mixed and rather copiously interspersed therethrough; the consistency of this being such that it will spread readily over a surface. It is put in a layer on one of the sheets of fibrous material throughout the whole length and breadth thereof. The plaster layer is then allowed to dry—i. e., to harden—whereupon the manufacturer coats its exposed surface with a waterproofing liquid, such as paint, which also has the property of adhesion. While the paint is still wet, or partially so, another sheet of the fibrous material is laid thereon, having, of course, the same dimensions as the first sheet, and also having its contour corresponding

with that of the first for the purpose of imparting neatness of appearance to the finished product. So much of the plaster material as may project beyond the edges of the fibrous material may be cut away, or otherwise removed before it sets. This patent has six claims, in which the method of making the board is set out substantially as has been stated. The plaster board made under this patent is specifically distinguished in the specification by the inventor in one aspect from other plaster boards, "in that the fibrous body is tough and at least approximately as thick as the plaster layer."

These five patents are the record evidence of the prior art in the process of making plaster boards at the date when the first process patent was issued to plaintiffs. Do they show anticipation? There are, in these patents, certain unrelated elements scattered in fragments through the thirty-five claims that resemble in some minor respects certain elements in claims 8 and 9 of plaintiffs' patent No. 1,176,322; but they are not assembled in any claim or patent in such relation, order, or succession of steps as a process, so as to accomplish the purpose of plaintiffs' process and thereby constitute an anticipation of their process, and at least two of the elements contained in claims 8 and 9 cannot be found in any of the alleged anticipating patents, as, for example, the use of a sheet of paper, or two sheets of paper, or the like, treated to retard permeation of moisture, and the gradual hardening of the plastic substance during the retarded permeation of the paper, or the like, by the moisture of the plastic substance. The plaintiffs' process provides that the paper treated to retard permeation of moisture shall correspond in that quality with the gradual hardening of the plastic substance inclosed between the sheets of such paper.

[9] We do not find this important and dominant feature of claims 8 and 9 in any of the claims of the alleged anticipating patents. Without it there can be no anticipation. As said by the Supreme Court in Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 424, 22 Sup. Ct. 698, 707 (46 L. Ed. 968):

" * * * A process patent can only be anticipated by a similar process. A mechanical patent is anticipated by a prior device of like construction and capable of performing the same function; but it is otherwise with a process patent. The mere possession of an instrument or piece of mechanism contains no suggestion whatever of all the possible processes to which it may be adapted. Fermentation Co. v. Maus, 122 U. S. 413, 428. If the mere fact that a prior device might be made effective for the carrying on of a particular process were sufficient to anticipate such process, the absurd result would follow that, if the process consisted merely of manipulation, it would be anticipated by the mere possession of a pair of hands."

The defendant further sets up in its amended answer alleged anticipations in the prior public use of plaintiffs' process by certain persons and corporations named in the amended answer. The voluminous record is taken up largely with the depositions of numerous witnesses, who were called by the defendant to testify concerning such alleged prior uses. We have read this testimony carefully. It would extend this opinion to an unreasonable length to review this testimony in detail. We think it is not required. It will be sufficient to say, as we have said, with respect to the prior patents, that there are scattered elements in these various uses which this testimony tends to show was

not so much in anticipation, or in any sense a realization of the object sought, as it was the search for a process that would enable the plaster board manufacturers to achieve the result successfully accomplished by the plaintiffs. Did any one of these processes do anything more than forecast, in a more or less vague way, the possible and hoped for result? Was it not a prophecy, like many another, written after the event?

One of these alleged prior uses was that of the Pioneer Plaster Company, at Seattle, Wash. George H. Herzberg was the shop superintendent and a stockholder. He testified that the first board made was handmade without power machinery. They first used a sheet iron plate, slightly larger than the board intended to be made, putting a rim around all four edges, the thickness of the board. Later on they had a plate made of a casting with a pan curved out on both sides, and that was pivoted. They laid paper, cut the right size, into the pan, and by hand laid mortar on the paper, and spread it out, and leveled it off with a trowel or darby, and then laid another piece of paper on top, and rubbed and crushed that into place by hand, and then they revolved the pan. They turned it the other side up. Then the plaster board, in a soft condition, fell out onto a pallet that was held there to catch it. They then carried the board, which was soft, to the side, and slipped it off of the pallet and onto the pile or stack. This pan was then ready for the next board. The size of this plaster board was 32 by 36 inches. It was used entirely as a lathing material to be plastered over.

Application was made December 27, 1910, by Ernest A. Herzberg and George H. Herzberg for a patent for an improvement in plaster board machinery. The patent was issued March 5, 1912. It had two claims, which included an invertible table, pivotally supported by the opposite side of the frame, a pan for the table, and a pallet serving as a cover for the pan, devices detachably coupling said pallet with the table at one side and with the pan between, and manually actuated means whereby the leaves may be swung into position to support the pallet after same has been presented thereto by the inverting of the table. The patent described what appears to be mechanical means for carrying out the uses substantially described in the Herzberg testimony, covering, first, the handmade, and, second, mechanical, processes. For the mortar they used waterproof paper, a cotton wood fiber, water, and a chemical called a retarder, mixed with plaster. The retardation adopted was timed for 45 minutes. They found that, using the same ingredients on the machine that were used in the handmade board, the result was not quite the same; in fact, not satisfactory. It seemed that the cotton wood fiber did not mix thoroughly in the machine. Clearly, there was no prior use in the Herzberg process.

Among other alleged prior uses was the process of making inside wall covering substantially in accordance with patent No. 520,123, issued to Augustine Sackett on May 22, 1894, heretofore referred to under the head of patent anticipation. This use is so manifestly not a prior use of plaintiffs' process that we need not enter into a comparison of the essential elements and their differences. The same may be said of all the other alleged prior uses set up as a defense.

In the course of the proceedings defendant introduced the affidavit of Ford W. Harris as an expert witness. He was an electrical and mechanical engineer and a registered patent attorney and an attorney at law; had been an attorney in considerable patent litigations, and had prepared and prosecuted over 500 patent applications before the United States Patent Office, and believed himself to be thoroughly competent to understand and to explain the specifications and drawings of letters patent. He explained the elements of the patents in suit; the prior patents and prior uses in the manufacture of plaster board. He described the machinery of defendant's plant, one set of which was an apparatus for producing wallboard, and another separate set of apparatus for producing buttonlath. His conclusion was that he did not find in the prior art the combinations described in the Schumacher patent; but he was of the opinion that, all the steps being old, it seemed to him to be obvious that they should be used together. He was therefore of the opinion that it required no invention to use them successively under a single roof.

It was conceded by the plaintiffs that the elements were old, and we concede that it was not invention to use them successively under a single roof; but the evidence introduced on behalf of plaintiffs established the fact that the combination in plaintiffs' process was new, and not obvious, as they had never been so constructed before and had never produced long wallboard, such as plaintiffs' product, in a complete and effective structure, to be cut into shorter lengths, if required. The fact that plaintiffs' product went into immediate use, and the process has been operated with greater speed and economy, saving in shop space, and producing a better product than prior processes, and with greater saving of scrap and waste, is strong evidence of invention, and, we think, with the other elements disclosed, sufficient to establish the validity of plaintiffs' patent as an invention.

The most interesting, and perhaps the most instructive, case upon this subject of process invention, in all its bearings upon the questions involved in this case, is the recently decided case in the Supreme Court of Eibel Process Co. v. Minnesota & Ontario Paper Co. The decision of the Supreme Court has not yet been published in the Supreme Court reports, but it may be found in the advance sheets of the court's decisions under date of February 19, 1923. 43 Sup. Ct. 322, 67 L. Ed. ——. The invention there described related to the manufacture of news print paper, and the process has features similar to the process in this case.

The Fourdrinier machine for making paper had for many years been well known and most widely used for making news print paper. By improving the stock and by strengthening the parts the speed of this machine had been brought up to between 500 and 600 feet per minute. But, when this speed was attained and maintained for any length of time, the operation showed defects in the paper, described as waves and ripples, which were only overcome by a reduction of speed to less than 500 feet per minute.

Eibel's invention was to enable the paper maker to increase the speed to 600 or 700 feet, and even more, and still produce a good product. To do this, he increased the pitch of the wire at the initial point

from 15 to 24 inches, giving the stock the added force of the down-hill flow, and the speed of the machine to correspond, so that the speed of the stock and the speed of the machine were increased co-opera-tively to from 600 to 700 feet, reaching this efficiency by experiment and actual trial. The questions in controversy were: Was the patent void for indefiniteness, and was this improvement an invention, or the exercise of mere mechanical skill, and, if invention, had the defendant infringed?

The District Court for the Western District of New York, in the case of Eibel Process Co. v. Remington-Martin Co., 226 Fed. 766, had held that the patent did not specify or indicate any degree of declen-sion for the paper-making wire, or any rate of speed for either stock or wire. Hence nothing was to be done that had not been done before, except to regulate the speed of the wire to correspond with the speed of the stock. The patent was accordingly declared void for prior pub-lic use. On appeal, the Circuit Court of Appeals for the Second Cir-suit (234 Fed. 624, 148 C. C. A. 390) held that Eibel's improvement effected a great economy; that it was not anticipated by prior patents or prior use, and was not invalid for indefiniteness of the claim. The decree of the District Court was accordingly reversed.

In the District Court for Maine (267 Fed. 847), in a suit upon the same patent, the court held that the patent was not invalid for indefi-niteness of claim, and that, where there is doubt as to the patentable novelty, this doubt may be resolved in favor of the patent by its com-mercial utility (citing Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177). On appeal, the Circuit Court of Appeals for the First Circuit (274 Fed. 540) held that the patent was void for indefiniteness of claim and as differentiated from the prior art only by a mere change in degree. The decree of the District Court was reversed, and the bill dismissed.

Because of this conflict in the two Circuit Courts of Appeals, certio-rari was granted by the Supreme Court to review the latter decree. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 Sup. Ct. 322, 67 L. Ed. ——. In the Supreme Court of the United States Chief Justice Taft delivered the opinion of the court, in which he discussed certain features of the case, which are so like certain fea-tures of the present case that we think the discussion is peculiarly applicable here. He said:

"The plaintiff's case as presented on the record is largely the presumption of validity and novelty attaching to the patent and such evidence as comes from defendant's witnesses."

This is precisely the case in the record before us.

Referring to the fastest machine in the prior art, he said:

" * * * The owners of these fastest machines, at once upon Eibel's pub-lication of his discovery, adopted his pitch and increased their product. * * * *"

Not unlike the action of the defendant in this case in adopting plain-tiffs' short belt machine, the use of paper treated to retard permeation

of moisture, and other conveying devices in plaintiffs' combination process. •

The Chief Justice continues:

"The fact that the Eibel pitch has thus been generally adopted in the paper-making business and that the daily product in paper making has thus been increased at least 20 per cent. over that which had been achieved before Eibel, is very weighty evidence to sustain the presumption from his patent that what he discovered and invented was new and useful."

The evidence in this case shows that plaintiffs' process made a greater output per day, twice as much as the prior art could turn out in the same time.

Referring to other patents that were set up in defense, some of them showing devices for raising the breast roll and wire above the level, and lowering them below the level for the purpose of drainage, the Chief Justice said:

"There was a constant straining by the witnesses for the defense to increase the elevation before Eibel. On the direct examination they began with a positive assertion that a pitch of 4, 5, and even 6 inches, had been used in certain machines before Eibel's time; but written records, contracts, and specifications brought out on cross-examination show nothing more than 3 inches provided for purpose of drainage, and not more than that was used. This is not to say that witnesses, in the face of such records, did not testify to a higher elevation; but in such cases the amount of elevation rested in memory running back more than 10 or 15 years, a memory stipulated by the subsequent high pitches of Eibel and the retrospect of the progress that now seems so easy and clear to every one. * * * The oral evidence on this point falls far short of being enough to overcome the presumption of novelty from the granting of the patent. The temptation to remember in such cases, and the ease with which honest witnesses can convince themselves after many years of having had a conception at the basis of a valuable patent, are well known in this branch of law, and have properly led to a rule that evidence to prove prior discovery must be clear and satisfactory"—citing Barbed Wire Patent Case, 143 U. S. 275, 284, 12 Sup. Ct. 443, 450, 36 L. Ed. 154; Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177.

In the present case the oral testimony upon essential elements is far from convincing in discrediting plaintiffs' invention.

Again referring to the prior art, the Chief Justice says:

"In administering the patent law the court first looks into the art to find what the real merit of the alleged discovery or invention is and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent to secure to the inventor the reward he deserves."

The court says further:

" * * * We think that Eibel made a very useful discovery, which has substantially advanced the art. His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious and entitled to liberal treatment."

We are of the opinion that plaintiffs' patent should be so classified in the art to which it relates.

Referring to the sufficiency of the specification, the Chief Justice says:

"This patent and its specifications were manifested to readers who were skilled in the art of paper making and versed in the use of the Fourdrinier machine. * * * The immediate and successful use of the pitch for this purpose by the owners of the then fastest machines and by the whole trade is convincing proof that one versed in paper making could find in Eibel's specifications all he needed to know, to avail himself of the invention. Expressions quite as indefinite as 'high' and 'substantial,' in describing an invention or discovery in patent specifications and claims, have been recognized by this court as sufficient"—citing Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Rubber Co. v. Goodyear, 9 Wall. 788, 794, 19 L. Ed. 566; Mowry v. Whitney, 14 Wall. 620, 629, 20 L. Ed. 860; Lawther v. Hamilton, 124 U. S. 1, 9, 8 Sup. Ct. 342, 31 L. Ed. 325; Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 436, 22 Sup. Ct. 698, 46 L. Ed. 968; Abercrombie & Fitch Co. v. Baldwin, 245 U. S. 198, 205, 38 Sup. Ct. 104, 62 L. Ed. 240.

Referring to the objection that the alleged invention covered only a matter of degree in pitch, which could not be the subject of a patent, the Chief Justice said:

"The prior art showed the application of gravity by use of the pitch of the wire to the improvement of the Fourdrinier machine, and Eibel, it is said, merely increased degree of pitch and gravity for the same general purpose. We think this attack upon the patent cannot prevail."

After further discussion, the decree of the Circuit Court of Appeals, dismissing the bill, was reversed, and the decree of the District Court affirmed. By this judgment of the Supreme Court the Eibel patent was held valid, upon the closely contested questions relating to plaintiff's disclosure as to the elements of his invention, the degree of improvement on the prior art, and the novelty and utility of such improvement. Upon the authority of this case alone, and the facts to which it is applicable in the present case, we might well uphold the Schumacher processes, and the process as a whole, and the apparatus invented by them to carry out such processes.

We conclude that patent No. 1,176,322, designated as the "first process patent," is valid as to all the claims therein; specifically that claims 1 to 7 are valid, as involving invention, and that claims 8 and 9 have not been anticipated and involve invention.

The court below, in its decree, found that patent No. 1,176,860 (second process patent) was good and valid in law as to each and all the claims thereof, and that defendant had infringed each and all of the said claims by making plaster board, also known as wallboard; such plaster board, also known as wallboard, having been known to the trade as Peters wallboard, or the like, but not infringed in making buttonlath. This last question is the only one involved in this patent before us on this appeal.

The other patents involved in this suit, namely, claims Nos. 1, 2, 3, 4, 5, 7, and 8 of patent No. 1,197,553, for a feeding and severing apparatus, designated as the "cutting apparatus"; No. 1,259,049, for apparatus for finishing plaster board and the like, designated as the "kiln car patent"; and No. 1,286,801, for apparatus for finishing plaster board and the like, designated as the "tilting tray patent"—having all been found valid by the decree of the District Court, and no appeal having been prosecuted from that portion of such decree, it follows that plaintiffs' entire process, including patent No. 1,176,322 (first

process patent), the patented mechanical means for carrying the process into operation, is a valid process, and that plaintiffs are entitled to a decree so adjudging. . '

The remaining questions are whether such patents have been infringed by the defendant in making wallboard, plaster board, or buttonlath. Interrogatories were filed by the plaintiffs under equity rule No. 58, requiring the defendant and its officers to make discovery of facts and documents material to the support and defense of this action. Under order of the court, these interrogatories were answered. In the answer of Charles A. Peters, the superintendent of the defendant, the Buttonlath Manufacturing Company, it was admitted that the defendant had used the plaintiffs' process described in the claims of patent No. 1,176,322 (first process) and patent No. 1,176,860 (second process). This answer was also adopted by the officers of the company in making their separate answers to the interrogatories.

In the defendant's statement of the steps of plaintiffs' claims which had been used by defendant in the manufacture of Peters wallboard and buttonlath, substantially the same admissions were made. We conclude that the defendant infringed all the claims of patent No. 1,176,-322 (first process) in the process of making Peters wallboard and in making buttonlath, as hereinafter limited. But the evidence in the record does not disclose the extent of such infringement. A reference to a master will therefore be required to determine the extent of such infringement.

Having determined that the process used by the defendant in making buttonlath under the specification, drawings, and claims contained in patent No. 1,115,593, issued to J. P. Sexton on November 3, 1914, reissued as patent No. 14,148 to J. P. Sexton, June 6, 1915, did not anticipate plaintiffs' process, described in their patent No. 1,176,322, it follows that the use of that process by defendant in making buttonlath, as described in Sexton's patent, does not infringe plaintiffs' process patent No. 1,176,322 or No. 1,176,860, and is so limited.

[10] The court below found that claims Nos. 1, 2, 3, 4, 5, 7, and 8 of plaintiffs' patent No. 1,197,553 (feeding and severing apparatus) was valid and infringed by defendant, but not in making buttonlath. We concur in the last-mentioned finding, but with the limitation above stated, that the exemption is buttonlath made in accordance with the specification, drawings, and claims of the Sexton patent.

## Patent No. 1,259,049.

The court below found that plaintiffs' patent No. 1,259,049 (kiln car patent) was valid, but not infringed. This invention is related to the subject-matter of prior inventions patented by plaintiffs for making plaster board and the like. It is stated in the specification that it may be utilized in carrying on the process described in patent No. 1,176,322.

Reference is made to the plaster board product of that process and the carrying of the process to a finality by the invented apparatus designed to facilitate by successive steps the hardening or setting of the plastic substance and completing the same in the production of plastic board units, which will be superior in point of relative simplicity and inexpensiveness in construction and organization with high efficiency

and superiority of product produced thereby. In the four claims of the patent, this superiority is identified as an apparatus for drying plaster board, in which there is a carriage comprising a framework and spaced transverse members adapted to support a plurality of plaster board units at their lower edges, a plurality of vertical spacer stakes applied to said carriage, and a spacer element on each stake and adapted to separate adjacent plaster board units from each other.

The spacer element is further identified in the specification as vertical stakes, each provided with spacer elements contacting only with small areas of the surfaces of the sheets or units, so that, when the carriage is placed in the kiln, the circulating warm air may pass longitudinally, as well as vertically, over nearly the entire surfaces of the plaster board, the spacers on the stakes contacting superficially with the units over very small area; in other words, adapted to separate adjacent plaster board units from each other in the drying process, and permit the free and equal circulation of the warm air over as much of the entire surface of the plaster boards as possible and at the same time, thus providing for the quick and equal drying of the boards and at the same time avoiding the marking of their surfaces by contact and an unequal drying process.

Charles A. Peters, defendant's superintendent, in his answer to interrogatories and as a witness on the stand, admitted the use by the defendant of a kiln car substantially as described in this patent. The only difference appears to be the form of the spacer blocks on the stakes. Defendant's car appears to work substantially in the same way to accomplish practically the same result. It is therefore an infringement.

## Patent No. 1,286,801.

The court below found that plaintiffs' patent No. 1,286,801 (tilting tray) was valid, but not infringed. The invention is also related to the subject-matter of plaintiffs' prior inventions for making plaster board and the like. It is specifically identified as improvements in apparatus for finishing plaster board and the like, prior to the drying of the board, and is in part a division of the application which culminated in the prior described patent No. 1,259,049.

The invention resides in the provision of means for supporting plaster board so that it may be readily transported and safely handled while moist, and before a hardening thereof, without tearing or derangement of the same. In the method of handling plaster board, such as this invention is associated with, the newly made board is stacked one unit upon the other horizontally in relatively large sheets, and as these sheets are moist, the plaster not having become set at this time, it is impossible to pick up the individual sheets or units when lying in stacked relation horizontally without a resultant tearing or derangement thereof. Inasmuch as it is necessary to pick up these sheets or units individually and stack them in vertical or substantial upright relation upon a frame which is run into a kiln in order to dry the plaster board, it is the primary object of this invention to provide a supporting means for the stacked sheets, which means may be disposed so as to lie in substantially upright position, and to thus dispose the sheets in corre-

sponding position, so that they may be readily individually handled while held in substantially upright position without the possibility of breakage, tearing, or other derangements.

In the three claims of this patent, the invention is identified as a plaster board finishing apparatus, having a substantially horizontal support for a tiltable tray mounted thereon, including a flat bottom board and a side wall projecting from one of its edges. The tray is tiltable into an upright position, and has means for supporting the tray in an inclined position, with the edges of the plaster board sheets resting upon the side wall. The tray has feet on side wall, arranged for engagement with the support to position the tray in an upright position.

Charles A. Peters, defendant's superintendent, in his answers to interrogatories and as a witness on the stand, admitted the use of an apparatus since about December, 1918, which he described as a platform which has the sleighlike skids adapted to run on a line of flanged wheels. This platform has, at one of its longitudinal edges, two socket brackets in which two stakes are placed at the edge of the pile of plaster board resting on the platform. The platform, after the stakes have been placed upon edge, is hoisted up at the opposite edge by a block and tackle, its first-mentioned edge resting upon the line of flanged wheels. This apparatus appears to us to work in substantially the same way, to accomplish practically the same result, and is therefore an infringement.

The decree of the court below is reversed as to patent No. 1,176,322, with direction to enter a decree in favor of the plaintiffs on that patent. With respect to the other patents here involved, viz. patent No. 1,197,553, patent No. 1,259,049, and patent No. 1,286,801, the case is remanded, with direction to enter a further decree in favor of plaintiffs in accordance with this opinion.

DIETRICH, District Judge, dissents from the decision in so far as it reverses the decree of the lower court with respect to patent No. 1,176,322.