**ANRAKU v. GENERAL ELECTRIC CO.**

**PACIFIC IMPORTING CO. et al. v. SAME.**
Nos. 7959, 7960.

Circuit Court of Appeals, Ninth Circuit.
Dec. 20, 1935.

Rehearing Denied Feb. 24, 1936.

J. Calvin Brown and Charles C. Montgomery, both of Los Angeles, Cal., for appellants.

Charles Neave and Hubert Howson, both of New York City, and Leonard S. Lyon, of Los Angeles, Cal., and John H. Anderson, of New York City, for appellee.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

From decrees ordering injunctions to be issued perpetually restraining the infringement of three claims of a patent owned by appellee, General Electric Company, by defendants in three suits in their sale of incandescent electric lamps, and ordering an accounting, the defendants in two of the suits only have appealed. All three cases were by stipulation tried together before a special master appointed by the court below, and the two cases in which appeals have been taken were presented to this court together.

The special master heard the testimony and reported his findings and conclusions. The special master found that appellee's patent has been infringed, and the trial court overruled the exceptions to the findings, adopted them, and entered the decrees accordingly.

The history and problems of the development of the filament in incandescent electric lamps up to the time of the Pacz patent, which is owned by appellee, and is the one at issue here, are set out in the following findings of the special master:

"The subject matter of the suit involves the filament of the well known incandescent electric lamp. The pertinent history of the incandescent lamp began some fifty years ago when Edison brought out the first commercially successful lamp. The Edison lamp with a carbon filament remained the standard of the industry until the availability of tungsten as a filamentary material was disclosed by the invention of Just and Hanaman in 1906. The first tungsten filaments were of the squirted or pressed type. Tungsten powder was combined with a binding material in a plastic mass and then squirted under pressure through a die to a fine thread, after which it was dried and sintered to form a filament of substantially pure tungsten. These threads were formed in V-shaped segments and each segment was separately welded to anchoring means which were a part of a framework within the lamp bulb. * * * Inasmuch as tungsten offers less resistance to the passage of electric current than carbon, it was necessary to make the filaments of a smaller diameter and greater length than a carbon filament designed for the same use. Tungsten had an advantage over carbon as a filamentary material in that it made a much more efficient lamp, giving more light of superior spectral quality for the amount of current consumed.

"The disadvantages involved in the use of tungsten came from the fact that the filaments were extremely brittle and failure from breakage was common. Squirted or pressed tungsten filaments were used until Dr. William D. Coolidge developed a process for the manufacture of ductile tungsten. The Coolidge filament was a drawn wire which could be made in any desired length and readily draped over the anchors within the lamp. * * *

"One of the problems involved in the development of tungsten filament was caused by the phenomenon known as 'offsetting.' It was noted that if the grains of tungsten which made up the filament were so large in size as to entirely occupy a cross section of the wire, grain boundaries would be formed which were substantially perpendicular to the axis of the filament. When heated to incandescence movement would occur at these boundaries * * * Coolidge in his Patent, * * * offered a remedy for offsetting. During the preparation of the tungsten ingot from which the filament was to be drawn he introduced a small percentage of thoria. The presence of thoria had the effect of retarding grain growth so that the resulting filament was made up of very fine grains of tungsten, none of which were sufficiently large to extend across the diameter of the wire. * * * In such a filament offsetting is eliminated.

"After the development of thoriated filament, the gas filled lamp using a coiled filament was invented by Dr. Langmuir of the General Electric Company. The circulation of gas by convection in the Langmuir lamp caused an increased loss of heat, thereby lowering the efficiency of the lamp. To minimize this loss Langmuir used a tightly coiled filament so as to confine the heated portion of the lamp to as small an area as possible. At this point in the development of the art the phenomenon of sagging became a serious problem. The thoriated filament of Coolidge, when heated to incandescence tended to elongate. In a coiled filament this resulted in opening up the coils with an increased loss of heat by convection. The only remedy was to provide a large number of supports which reduced but did not eliminate sagging of the filament. This was the state of the practical art at the time of Pacz's disclosure." * * *

The object of the Pacz invention is shown in his specification as follows: "The object of my invention is to produce tungsten metal which will retain to a much higher degree than heretofore its original properties after being subjected to high temperature. In the case of incandescent lamp filaments, the high temperatures at which they are run have caused them to elongate and sag between their supports. This is especially noticeable in coiled filaments, and in gas filled lamps this tends to reduce the efficiency of the lamp on account of the increased cooling effect on the filament. By means of my invention the sagging is substantially eliminated and 'offsetting' of the filament is substantially prevented, during a normal or commercially useful life of the lamp."

The Pacz patent covered both the process of manufacture and the product of the process. Defendants imported from Japan and sold here lamps and the filaments contained in them which were manufactured in Japan. The process by which the lamps were manufactured is not disclosed by the evidence. Since the process of manufacture was not used in this country, appellee was unable to show infringement in that respect, but limited its contention of infringement to the product of the process. Claims 25, 26, and 27 are in issue here. Claim 25 is: "25. A filament for electric incandescent lamps or other devices, composed substantially of tungsten and made up mainly of a number of comparatively large grains of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life for such a lamp or other device." Claim 26 differs only in that it specifies that the filament is a "drawn" filament. Claim 27 differs from claim 25 in specifying that the filament is "composed of tungsten containing less than three-fourths of one percent of non-metallic material."

Appellants urge that there was no infringement by defendants because, first, the claims in issue are void; and, second, lack of proof of infringement.

■ We have heretofore said that the findings of the special master in such cases are entitled to great weight (Waxham v. Smith, 70 F.(2d) 457), and that we will not weigh the evidence where there is some substantial evidence to support such findings (Stoody Co. v. Mills Alloys, 67 F.(2d) 807).

### Validity of the Claims.

■ In the case last cited 67 F.(2d) 807, page 809 it is said:

"In its brief, the appellant * * * says: 'The general rule is that a patent is presumptively valid. This presumption arises from the grant of the patent by the Patent Office after the application has been examined thoroughly by the Examiner.'

"The foregoing excerpt unquestionably correctly states both the rule of law and the reason therefor."

With these principles in mind, we examine the specific points relied on by appellant and alleged to show that the claims are invalid.

■ 1. It is contended that the "claims" are void because "the objects" of the Pacz application "are not those of the claims"; that "the object of that application is the purification of the tungsten, not the production of tungsten grains of any relative size or of any characteristic contour." Assuming, without determining that the claims must conform to the purpose as stated, appellants are in error in this contention for the reason that they assume the purpose of the application to be the purification of tungsten. This assumption is based on the various statements in the specification mentioning that the tungsten by the Pacz process "will retain to a much higher degree than heretofore its original properties." The specification also contains such words as "to accomplish the purification," the "purifying material," "purifying agent," and it is said "This method is desirable in that certain basic impurities are thus eliminated at the beginning."

The special master found as follows: "* * * In view of the evidence, nothing is found that tends to prove that the applicant did not attempt to fully describe his invention or that he attempted to cover more than was necessary. * * *"

There is substantial evidence to support this finding. The object of the invention, quoted above, is to substantially eliminate offsetting and to substantially prevent sagging in a tungsten filament. These purposes were accomplished by his invention. In the application, Pacz stated: "In the preferred form of my invention I bring into intimate association with tungsten a material which will have the desired influence upon the grain growth of the metal. * * *"

And thereafter briefly describes his method, and then states:

"Considering my invention from the physical standpoint, the presence of the material has an influence on the grain growth of the metal. When the metal reaches the temperature at which extensive grain growth would ordinarily take place, the presence of this material intimately associated with the tungsten particles has a marked effect on the shape and size of the tungsten grains. The ingot of tungsten thus produced, whether it be due to the fact that the grains have not reached the equilibrium grain size or to other causes, is particularly susceptible to grain growth during subsequent heat treatments.

"The probable reason why filaments made according to my invention do not sag, is that the structure is comparatively coarse grained. The coarse grained filament produced by means of my invention does not 'offset' so as to cut short the life of the lamp appreciably."

We hold that there is substantial evidence supporting the finding that the purposes of the invention were to substantially eliminate "offsetting" and to substantially prevent "sagging."

2. It is next contended that the claims are void because they attempt to cover an invention differing from that disclosed in the patent, for the reason that because the specification does not describe the actual "size and contour" of the grains attained by the process; and because the application does not describe how the size and shape of the grains prevent "offsetting," although it does say that "sagging" is prevented probably for the reason "that the structure is comparatively coarse grained."

The master found that the disclosure was sufficient, and on this point said: "The claims are drawn to a filament made up of comparatively large grains of such a size and contour as to prevent offsetting and sagging. It is necessary to examine the specifications to determine, if possible, the definite meaning of these terms. The most helpful statement by the patentee is found on Page 1, beginning line 60. Here it is said that probably the coarse grains resist sagging and offsetting. But this, together with the whole of the specifications, does not give the reader a complete conception of the Pacz structure. To obtain such a concept it is necessary for the worker in the art to follow out the Pacz process to its ultimate conclusion. Then he will find that the resulting filament is composed of grains each of which is large enough to fill the whole cross section of the filament and that the grain boundaries are uneven with the absence of cleavage planes. * * *"

The claims do not describe the actual "size and shape" of the grains, and therefore such description in the specification is immaterial. Further, such description would probably be impossible because of the minuteness of the grains and because each grain varies in "size and shape" from the other.

With respect to the failure to describe how the size and shape of the grains prevent offsetting, it would appear that such a description would be describing a scientific theory or principle. Such description might be helpful to one not skilled in the art in enabling him to more clearly understand the nature of the invention, but it is immaterial. In Eames v. Andrews, 122 U.S. 40, 55, 7 S.Ct. 1073, 1082, 30 L. Ed. 1064, it is said: "It is to be observed that the scientific theory and principle * * * are not set forth either in the original or reissued patents. This feature was commented upon by Mr. Justice Blatchford in Andrews v. Cross [C.C.] 8 F. 269, 19 Blatchf. 294, 305, as follows: 'It may be that the inventor did not know what the scientific principle was, or that, knowing it, he omitted, from accident or design, to set it forth. That does not vitiate the patent. He sets forth the process or mode of operation which ends in the result, and the means for working out the process or mode of operation. The principle referred to is only the why and the wherefore. That is not required to be set forth. * * * An inventor may be ignorant of the scientific principle, or he may think he knows it and yet be uncertain, or he may be confident as to what it is and others may think differently. All this is immaterial, if by the specification the thing to be done is so set forth that it can be reproduced.'"

Appellants, to support their contention that there is no novelty or invention, rely principally on the prior art which they say "directly anticipates the Pacz metals," and discuss no less than sixteen prior patents. The special master found:

"The record in this case establishes that the filament produced by Pacz has a grain size which distinguishes it from the prior art structures. The breadth of that dis-

tinction is seen by comparing the Pacz filament with the thoriated filament. The contour of the grain boundaries is entirely different from any disclosure or suggestion of the prior art. It follows that these particular features of the Pacz filament are due to unusual and radical changes in the grain pattern of substantially pure tungsten. It does not appear that the grain structure of Pacz is naturally inherent in tungsten. * * *

"Coolidge and many others in the art worked toward small grained filaments, willing to sacrifice resistance to sag to avoid the greater evil of offsetting. Consequently the development of a filament of comparatively large grain size which neither sagged nor offset was an unexpected departure. It was new, useful and the result of inventive thought."

"The prior art may be summed up to this effect: that 'offsetting' had been taken care of by Coolidge's teaching of a small grained structure; that sagging had been recognized as a problem by Pintsch for which he offered a solution by producing a filament of single grained structure. In all of the many patents and publications cited there is no suggestion that a large grained filament could be produced which would have the quality of resistance to both offsetting and sagging. A study of the prior art tends to strengthen the patent rather than weaken it."

Appellee's expert, Dr. Jeffries, carefully explained the details and problems connected with the development of the tungsten filament. He also carefully distinguished between the various patents relied on by appellants. Under these circumstances, we must hold that there is substantial evidence supporting these findings, and therefore the patent in issue is not invalid for lack of novelty or invention.

In connection with this point, appellants under a separate heading say:.

"The subject matter of the claims in issue is not patentable.

"What Pacz has produced by his process is natural tungsten in substantially pure form which has the natural characteristic of non-offsetting and non-sag when treated by the Coolidge process and flash aged in filament form.· Pacz did not create these characteristics but they were created by nature and cannot be the basis for the product claims. The merit of this product resides not in its form, a filament or wire, but in the material out of which it is made. The claims are therefore invalid."

Cases are cited to show that one cannot invent natural qualities.

The fallacy of this argument lies in the fact that the grain structure brought about by Pacz is not naturally inherent in tungsten. The master so found, and there is evidence to support the finding. The statement of appellants that the merit of the filament in question "resides not in its form, a filament or wire, but in the material of which it is made" as a general statement is correct. However, we gather from the evidence that not all tungsten filaments have merit, and that the merit of the Pacz filament is that the filament is made of tungsten in such a way that it will not off-set or sag.

4. It is contended that the claims are indefinite and for that reason invalid. Appellants state this point as follows: "The grain size is stated to be 'comparatively large' but no basis of comparison is given. The grain 'contour' is wholly indefinite. The 'sagging' and 'offsetting' purports to be defined by 'substantial' and 'during a normal or commercially useful life for such lamp or other device'. But what 'substantial' is in number of inches or in proportion to the size of the filament or otherwise, is not defined, nor how many hours, days, or other periods of time under various conditions constitutes 'commercially useful life.'"

This contention is based on 35 U.S.C.A. § 33, which provides in part: "Before any inventor * * * shall receive a patent * * * he shall make application therefor * * * and shall file * * * a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains, or with which it is most nearly connected, to make, construct, compound, and use the same."

Appellants cite a number of authorities to the effect that the "distinguishing features" must be set forth [Westinghouse Elec. & Mfg. Co. v. Quackenbush (C.C.A. 6) 53 F.(2d) 632]; that the "form, size or any other characteristic" must be specified [Walker on Patents (6th Ed.) § 217, p. 288]; that the "particular dimensions" must be specified [Bullock Electric Mfg. Co. v. General Electric Co. (C.C.A.6) 149 F. 409]; that the word "such" as used in the particular patent was too indefinite

[Knight Soda Fountain Co. v. Walrus Mfg. Co. (C.C.A.7) 258 F. 929].

Such authorities are not strictly analogous to the present case, as they deal with subjects vastly different from the case under consideration. In particular cases, it is undoubtedly true that all of these things must be completely described in order "to enable any person skilled in the art or science * * * to make, construct, compound, and use the same." It is apparent from the opinions in the cases cited, however, that such a description as is required by the statute was lacking.

Although statements in cases may be found discussing the sufficiency of description [Diamond Rubber Co. of New York v. Consolidated Rubber Tire Company, 220 U.S. 428, 435, 31 S.Ct. 444, 55 L. Ed. 527; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 66, 43 S.Ct. 322, 67 L.Ed. 523; and General Electric Co. v. P. R. Mallory & Co. (C.C.A.2) 298 F. 579, 588], we have held that whether or not a disclosure is sufficient, is a question of fact, to be proved by the evidence. Schumacher v. Buttonlath Mfg. Co. (C.C.A.) 292 F. 522, 532. A description of the patent under the statute is sufficient if it will "enable any person skilled in the art * * * to make * * * and use the same." To determine, therefore, whether or not a description is sufficient, we must ask the people who are in fact skilled in the art, for a court will not presume to be skilled in every art which may be involved in controversies. The master found the description to be sufficient, and that there is substantial evidence to support that finding is apparent by a perusal of the testimony of Dr. Jeffries.

Directly connected with this point is the point made by appellants that the filamentary grain "size and contour" are defined wholly in terms of use or function and therefore void. Cases cited among others are George K. Hale Mfg. Co. v. Hafleigh Co. (C.C.A.3) 52 F.(2d) 714, and Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 48 S.Ct. 474, 72 L.Ed. 868.

We believe that whether or not a description is so functional that one skilled in the art could not make and use the particular device described, is governed by the same rule as that which relates to indefinite descriptions, i. e. it is a question of fact, except where the description is "wholly" functional.

In regard to this point, the master found: " * * * The claims describe the physical characteristics of the grains, though imperfectly, yet sufficiently to define the invention. The inclusion of functional matter in the description aids in defining the exact invention, though standing alone it would have the effect of limiting the invention. * * *" The claims do not contain "wholly" a functional description, because they say "filament * * * composed substantially of tungsten and made up mainly of a number of comparatively large grains. * * *" We believe that there was sufficient evidence before the master to support such a finding.

With regard to the usual contentions made by those claiming insufficiency of description, it was aptly stated in General Electric Co. v. R. P. Mallory & Co., supra, 298 F. 579, page 588: "Patents often lend themselves to fine-spun theories; but it is singular how plain they are, if they are worth anything, to the man who wishes to infringe for profit."

The last point made by appellants with respect to the validity of the patent issued relates to the proceedings in the Patent Office. It is said that the original specification was filed February 20, 1917, and that it was completely canceled, except the first paragraph thereof, and a new application with a new set of claims was filed October 5, 1921. Subsequent to the time of filing the first application and prior to the time of filing the last one, consideration was given to the application and the amendments thereto at least three times. On all three occasions, the product claims were rejected, for the reason that the claims failed "to define the invention" and that "the applicant will not be allowed to define the product by the process of making it."

The contention seems to be that the claims as allowed vary from the original descriptive matter, and therefore appellee is estopped to assert that the claims in issue are valid, because appellee acquiesced in the rulings of the Patent Office.

The master found with respect to this contention: " * * * The file wrapper shows that from the beginning an attempt was made to claim a new structure. Though many claims were offered, withdrawn, rejected or allowed, there is nothing in the file wrapper which detracts from the force of the claims here in issue. * * *"

Upon comparison of the original and last applications, it appears that the only portions of the first one which were omitted in the last one relate to theory. In the letter of transmittal sent with the last application, it is said: " * * * It' will be found by comparing the amended specification with the original that the latter has been adhered to very closely. Certain portions of the original specification relating to theory have been omitted. For the sake of clearness it was deemed better to incorporate the entire specification in the amendment rather than to direct cancellation of portions of the original specification. * * *" Although the claims rejected and the claims allowed are nearly identical, they are distinguished by the addition in the claims allowed of certain descriptive matter, which was not contained in the claims rejected. The descriptive matter added, described the filament as being "made up of a number of comparatively large grains, and of such size and contour" as to prevent substantial sagging and offsetting. The absence of descriptive matter in the earlier instances was the ground of rejection, and the addition cured the defect. We find no merit in this contention.

### Infringement.

6. Appellants contend no infringement has been shown because they say the product claimed by appellee cannot be infringed unless it is proved that the infringing process was used to make the article, and that since there is no proof in this case of the process used to make the filaments in the lamps claimed to be an infringement, appellee's case must fail.

It is true that oftentimes a product claim may be so made that it is inseparable from the process described for making it, and that in such case where it appears that the claim for the product is limited by the process for making it, there must be proof that the product was made by the particular process by which it is limited in the claim. Warren Bros. Co. v. Thompson (C. C.A.9) 293 F. 745. In that case, however, this court expressly said, 293 F. 745, page 746: "It is true that a patent may be obtained for a new product, having definite characteristics which distinguish it, and that the patentee thereof may not necessarily be limited to the precise process which he describes as the method of making it."

In Providence Rubber Co. v. Goodyear, 9 Wall. (76 U.S.) 788, 796, 19 L.Ed. 566, it is said:

"A machine may be new, and the product or manufacture proceeding from it may be old. In that case the former would be patentable and the latter not. The machine may be substantially old and the product new. In that event the latter, and not the former, would be patentable. Both may be new, or both may be old. In the former case, both would be patentable; in the latter neither.

"The same remarks apply to processes and their results. Patentability may exist as to either, neither, or both, according to the fact of novelty, or the opposite. The patentability, or the issuing of a patent as to one, in nowise affects the rights of the inventor or discoverer in respect to the other. They are wholly disconnected and independent facts. Such is the sound and necessary construction of the statute."

In Merrill v. Yeomans, 94 U.S. 568, 571, 24 L.Ed. 235, it is said: "We can see no reason why the applicant for the patent, if he had in his mind a claim for the article produced, should have intended so to limit his claim. If the article was the discovery which he sought the exclusive right to make, use, and sell, he was entitled to that monopoly, however produced."

And in Holland Furniture Co. v. Perkins Glue Co., 277 U.S. 245, 254, 48 S.Ct. 474, 478, 72 L.Ed. 868, it was said: "We take it, as the respondent argues, that product patents or patents of compositions of matter are distinct from patents of the process by which the product may be produced. The former, if sufficiently described, may exist and be sustained independently of the latter. [Citations.]"

We find nothing indicating that applicant intended to limit the product by the process described in the application. The claims in issue make no reference to the process described. In the application immediately preceding the description of the process, it is said: "In order to comply fully with the requirements of the patent statutes, I will now describe one method or process embodying my invention and also modifications thereof. However, it is to be understood that the scope of my invention is such that many changes and substitutions will readily suggest themselves to those skilled in the art, and, as indicated, in the appended claims, are to be consid-

ered as forming part thereof." It seems clear to us that the intention of the applicant was not to restrict the product to the method described, but that he expressly recognized that there might be other methods of obtaining the particular product.

7. Appellants contend that no infringement has been shown because there was a lack of proof (a) "that in three dimentional [dimensional?] grains the third dimension pattern would be the same as the patterns of the planes shown in the photomicrographs, or that chemical causes were not the cause of the results obtained in the filaments in defendants' lamps;" (b) "that the coiled filaments in the defendants' lamps rely upon grain size and contour to prevent offsetting;" (c) "of non-sag of defendants' filaments."

We sustain the master's findings concerning these matters. They are supported by the evidence as outlined in those findings, as follows:

"A great deal of testimony was taken concerning the alleged infringing structures. The defendants admitted the sale in this district of lamps illustrated by the exhibits attached to the interrogatories. The plaintiff offered satisfactory proof that lamps were purchased from the defendants for experimental use. Certain of these lamps and evidence of the experiments conducted with them were received in connection with the examination of Dr. Samuel S. MacKeown. Dr. Thomas S. Curtis testified as to experiments made for the defendants. Certain lamps of the type used in these experiments and other evidence relating thereto was received. Both Dr. MacKeown and Dr. Curtis prepared photomicrographs of sections of the filaments of the several lamps. They also determined the amount of sag in defendants filaments after burning for a period of time. There is little disagreement between them as to the facts developed by their experiments.

"As to grain size and contour the photomicrographs are relied upon. There is some validity to Dr. Curtis' criticism of the accuracy of such photographs in that they show only one plane in cross section. However it is reasonable to assume that the grain contour shown as irregular in several cross sections of the same wire, would show the same lack of pattern in its other aspects. In absence of any showing to the contrary, this presumption will be considered as establishing the fact. All of the alleged infringing filaments were shown to be composed of substantially pure tungsten, in no instance containing more than three-fourths of one per cent of non-metallic material.

"The grain structure as shown by the photomicrographs is distinguished by large grains of at least sufficient size to extend across the diameter of the wire. The grain boundaries are uneven and in no instance are perpendicular planes of cleavage so disposed as to encourage off-setting.

"The experiments of MacKeown and Curtis, which consisted of observing the behavior of the filaments of defendants lamps under conditions of use, established their functional characteristics. No offsetting was observed. A study of the shadowgraphs taken before and after burning develops that in almost every filament a measurable degree of sagging occurs. The degree of sag is extremely small when compared with sag which develops in the thoriated filament of the prior art. The patentee claims the prevention of 'substantial' sagging. The defendant's filaments function within the intended and legal scope of the patent.

"All of the alleged infringing filaments are of the drawn type. They function within the intendments of the patent through a normal or commercially useful life. It does not appear that the phrase, 'commercially useful life', needs further definition. The use of the Pacz filament does not shorten the life of the lamp in comparison with lamps made of other filaments of the same wattage. No other known qualities have been sacrificed to obtain the results of the patent. The defendants have obtained such good practical results that they have found ready markets for their products."

8. There remains one further question to be considered. One of the defendants had on hand some samples 'of "Fuso" lamps, but did not sell any of them prior to the time that the bill was filed. He admitted, however, that he obtained the samples to show to the trade, and that the samples first received were not good; that he ordered other samples prior to the filing of this suit for the purpose of showing them to the trade. It is difficult to understand why he would wish to show them to the trade, unless he wished to sell such lamps.

Injunctive relief is given to prevent future sales. We know of no method by

which past sales may be enjoined, so long as the sales are completely made and the articles delivered. Appellants concede that threatened sales may be a sufficient basis for an injunction [see Canton Steel Roofing Co. v. Kanneberg (C.C.) 51 F. 599 and Historical Pub. Co. v. Jones Bros. Pub. Co. (C.C.A.3) 231 F. 638], but contend that the facts did not show a reason to fear sales in the future because the defendant testified he did not "want" to sell the lamps without a guaranty against infringement. We believe, however, that the presence of samples, and the fact that other samples were ordered, gave good reason to fear future sales of these lamps, and that by reason thereof the court below was justified in ordering the injunctive relief.

Affirmed.