## GENERAL ELECTRIC CO. v. WABASH APPLIANCE CORPORATION et al.
### No. 450.

Circuit Court of Appeals, Second Circuit.
Aug. 16, 1937.

Darby & Darby, of New York City (Samuel E. Darby, Jr., and Paul Kolisch, both of New York City, of counsel), for appellants.

Howson & Howson, of New York City (Hubert Howson, Merrell E. Clark, and Alexander C. Neave, all of New York City, and John H. Anderson, of Cleveland, Ohio, of counsel), for appellee.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

SWAN, Circuit Judge.

This is a patent infringement suit based on the Pacz patent, No. 1,410,499, owned by General Electric Company. The patent issued March 21, 1922, on an application filed February 20, 1917. It relates to tungsten filaments for incandescent lamps, and contains both process and product claims; but only product claims are involved in the present litigation. The defendants are charged with selling lamps having filament (purchased by them for assemblage into lamps) which infringes claims 25, 26, and 27 of the patent. The two individual defendants are the sole officers and stockholders of the corporate defendant.

It will suffice to quote one of the three claims in suit. Claim 25 reads as follows: "25. A filament for electric incandescent lamps or other devices, composed substantially of tungsten and made up mainly of large grains of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life for such a lamp or other device."

Claim 26 differs only in specifying that the filament shall be "drawn," and claim 27 in requiring the tungsten to contain "less than three-fourths of one per cent. of non-metallic material."

Concededly there was no novelty, when Pacz filed his application, in a filament, either pressed or drawn, composed substantially of tungsten. His advance, if any, over the prior art consisted in forming the grains or crystals "of such size and contour as to prevent substantial sagging and offsetting" during the normal life of a lamp in use. The filament of an electric incandescent lamp is a fine thread of conducting material which gives light by becoming incandescent. It is not stiff enough to support itself and must be strung between supports within the bulb. The heat to which the filament is subjected during operation of the lamp tends to deform it and cause it to sag between its supports. The specifications state that the object of the invention is "to produce tungsten metal which will retain to a much higher degree than heretofore its original properties after being subjected to high temperatures"; that in the case of incandescent lamp filaments the high temperatures at which they are run have caused them to elongate and sag between their supports, especially coiled filaments in gas-filled lamps, and this tends to reduce the efficiency of the lamp; that "by means of my invention the sagging is substantially eliminated and 'offsetting' of the filament is substantially prevented, during a normal or commercially useful life of the lamp." Parenthetically we depart from the specifications to explain that "offsetting" refers to a lateral shifting of a portion of the filament from an adjacent portion—like a slip at a geological fault line. The result is to reduce the cross-sectional area of the filament between the offset portions, causing it more readily to burn out or break. Offsetting takes place along the boundary lines between adjacent crystals during the heating of the filament in use. If the boundaries are perpendicular to the axis of the filament and extend across its width, offsetting is more serious than if the crystals are small or of irregular contour. We now return to the specifications. They continue with the statement that the inventor brings into intimate association with

tungsten a material which will have the desired influence upon the grain growth of the metal, and will be removed by volatilization during the sintering of the metal. It is explained that the presence of this material intimately associated with the tungsten particles "has a marked effect on the shape and size of the tungsten grains"; that the probable reason why filaments made according to the invention do not sag is that "the structure is comparatively coarse grained"; and that the coarse grained filament produced by means of the invention "does not 'offset' so as to cut short the life of the lamp appreciably." The remainder of the specifications deal with the patentee's process, which need not be described for present purposes further than to say that the preferred material which is brought into intimate association with the tungsten is an alkaline silicate.

The problems of sagging and offsetting were recognized long before Pacz entered the field, and efforts had been made to overcome them by adding beneficial ingredients to pure tungsten. The Coolidge patent, No. 1,082,933, issued December 30, 1913, to the plaintiff as assignee, and to which the patent in suit refers, taught how to make a tungsten filament which was as satisfactory in respect to offsetting as is the product of the Pacz patent. Although conceding that the Coolidge filament was nonoffsetting, the plaintiff contends that it was fine-grained and therefore necessarily a sagging filament. The patents to Schaller, issued in 1918 on applications filed in 1914, taught the production of a filament consisting of a single crystal throughout its whole length. This prevented both sagging and offsetting, but the method was too costly for general acceptance by the trade and found practical use only in small types of lamps, such as flash-light and Christmas tree lamps. In 1915 Kruger obtained a process patent for the production of tungsten filaments with a boron compound, which the defendant contends produced a non-sagging and non-offsetting filament because Pacz had so asserted in the patent in suit—a statement disclaimed by the plaintiff in 1933. Pacz himself, in a prior patent, No. 1,299,017, issued April 1, 1919, to the plaintiff as assignee, taught a process, very similar to that of the patent in suit, for producing a filament which "showed no offsetting after continued use" and of which the coils "retained their shape to a very high degree after continued use" (page 1, lines 98–103). Thus it is apparent that

the Pacz patent in suit was not a pioneer patent in respect to nonsagging and non-offsetting filament. What is claimed for the product of the patent in suit is that it does not sag as much as the multi-grained filaments of the prior art; in other words, it is urged that under the patent in suit Pacz was the first to produce a multi-grained filament having crystals large enough to prevent substantial sagging and of such irregular contour that, even though they extended completely across the filament, no substantial offsetting between their boundaries would occur during the normal life of the lamp.

The defendants first contend that the product claims in suit are invalid on their face for insufficiency and indefiniteness of disclosure. In each of the claims the element which purports to distinguish the Pacz product from the products of the prior art is described by the statement that the filament is "made up mainly of comparatively large grains of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life for such a lamp." In the specifications the grains are characterized, without basis of comparison, as "comparatively coarse," but their size and contour are otherwise left indeterminate except as tested by the behavior of the filament during operation, which test is also indefinite, since the phrase "substantial sagging and offsetting" is not defined. Hence it is argued that the public cannot know what degree of sagging or of offsetting is within and what degree without the plaintiff's asserted monopoly. Cf. Permutit v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L.Ed. 163; Kwik Set, Inc., v. Welch Grape Juice Co., 86 F.(2d) 945, 947 (C.C.A.2); National Theatre Supply Co. v. Da-Lite Screen Co., 86 F.(2d) 454 (C.C.A.7); Therm-O-Proof Insulation Co. v. Slayter & Co., 80 F.(2d) 557, 559 (C.C.A.7). In view of the difficulty, if not impossibility, of describing adequately a number of microscopic and heterogeneous shapes of crystals, it may be that Pacz made the best disclosure possible, although it would appear that he could have expressed in millimeters what he meant by "substantial sagging." The testimony is that a filament which sags not more than 5 mm. is a commercially "non-sagging" filament. However, the process of the patent is adequately described so that one may follow it, and, if the product claims be read to mean a substantially (i. e., a commercially useful) non-sagging and

non-offsetting filament having a grain structure such as is produced by following the process of the patent, they would seem to be sufficiently definite to inform the public of the limits of the monopoly asserted with respect to the product. The same three claims were sustained against a similar contention in Anraku v. General Electric Co., 80 F.(2d) 958 (C.C.A.9), certiorari denied 298 U.S. 678, 56 S.Ct. 942, 80 L.Ed. 1399. Because the appeal is to be determined on another point, we may assume, without the necessity of deciding, that the claims are not invalid for insufficiency or indefiniteness of disclosure.

The defendants further contend that the claims in suit are invalid because of anticipation by the prior art and want of invention. Their chief reliance is the Coolidge patent, No. 1,082,933, to which reference has already been made. The filament produced by the Coolidge process was admittedly a non-offsetting filament, and the defendants maintain that they have proved it to be as much a non-sagging filament as is the filament produced by the Pacz process. It may be remarked parenthetically that the plaintiff put in evidence no filament made in strict conformity with the process of the patent in suit. Since 1921 the plaintiff in its commercial production has made numerous changes from the process outlined in the patent, and only samples of its present commercial product were put in evidence. Of course, it is the product of the patent, not the plaintiff's commercial product, with which comparisons must be made. Dr. Jeffries, however, explained that the changes were made to obtain a more uniform commercial production and did not depart from the principles of the patent nor produce a different filament but only a greater percentage of the coarse-grained sagless filament than had been obtained from an exact following of the patented process. Coolidge described two methods of making his filament material. His preferred method heated purified tungstic oxid in a covered Hessian or Battersea Crucible, "after which step it is found to be coarser and of higher density and to contain matter, probably volatilized from the crucible * * *" consisting largely of alumina and silica (page 2, lines 74-84). His other method was to mix with tungsten powder certain refractory material such as oxide of thorium. To show that Coolidge's filament was fine-grained and one that would sag, the plaintiff introduced samples of thoriated tungsten filament. Such proof was good so far as it went, but it was not proof as to the structure of the filament produced according to Coolidge's preferred Battersea crucible treatment. This is likewise true of the microphotographs and expert testimony introduced by the plaintiff, none of which was directed to establishing that the Battersea filament was fine grained or prone to sag. It is true that Coolidge taught the retardation of crystallization in order to prevent offsetting, while Pacz teaches the growth of crystals to prevent sagging and the formation of crystals of irregular contour to prevent offsetting. But what Coolidge taught is immaterial with respect to the product claims in suit if the product of his Battersea treatment was in fact the same as that described in the claims in suit, for in that event the product so claimed was not new. If the addition of an alkaline silicate—as little as one-twentieth of 1 per cent. will suffice, Pacz says—has the effect of producing grain growth in the Pacz filament, it is argued by the defendants that it must have had a similar effect in the Coolidge Battersea filament. The only proof of the structure of the Battersea filament is that offered by the defendants. They put in evidence as Exhibit K microphotographs of filaments produced by strictly following Coolidge's Battersea method. Of the three lots of which samples were photographed, all showed grains large as compared with those of a thoriated filament; and two of the three showed a sag of only two millimeters after more than 100 hours' burning. Dr. Jeffries, the plaintiff's expert, had testified that a sag up to five millimeters was permissible for the Pacz filament. Thus, two of the three filaments shown on Exhibit K were substantially non-sagging. Moreover, the crystals were comparable in size and shape to those resulting from following the Pacz process. When this exhibit was first shown to Dr. Jeffries, and before he knew what filament it represented, he testified (fol. 429): "If one were judging from those two microphotographs alone, in the very restricted length shown and could be absolutely assured that the rest of the length of the filament has the same grain contour and the same grain size, the two micrographs could be described as representative of non-sag and non-offsetting Tungsten filament."

On rebuttal Dr. Jeffries testified that lot N–991 was a sagging structure because of the fine grain, and that lot N–989 would be a reject lot under the Coolidge process.

But he admitted he had had no experience in the manufacture of Coolidge filaments under the Battersea treatment, and his assertions, supported by no tests, that the filaments of Exhibit K must have sagged because Coolidge taught the production of fine grained filaments, cannot override the positive testimony of the defendants' witnesses that these filaments were produced in exact conformity with the Coolidge Battersea process and sagged only 2 mm. after 100 hours of burning. Cowles and Leise testified to the production by the companies by whom they were employed of great quantities of the Battersea filament which was commercially non-sagging. The Battersea treatment did not produce uniform lots, some sagged greatly, others only a little. The Pacz process gives more uniform production. But, in so far as the patent in suit claims a new product, we think the claims in suit were anticipated by filament produced by the Coolidge Battersea crucible treatment.

This result makes unnecessary a consideration of the other grounds of defense.

The decree is reversed, with directions to dismiss the bill of complaint.