## HASTINGS MFG. CO. v. AUTOMOTIVE PARTS CORPORATION et al.

## SAME v. SEALED POWER CORPORATION.

## Nos. 63, 65.

District Court, W. D. Michigan, S. D

May 5, 1941.

Earl & Chappell, of Kalamazoo, Mich., for plaintiff Hastings Mfg. Co.

Harry W. Lindsey, Jr., and George N. Hibben, both of Chicago, Ill. (Frank E. Liverance, Jr., of Grand Rapids, Mich., of counsel), for defendants Automotive Parts Corporation, and Perfect Circle Co.

Frank E. Liverance, Jr., and Lloyd C. Root, both of Grand Rapids, Mich., for defendant Sealed Power Corporation.

320

RAYMOND, District Judge.

### Findings of Fact.

1. The issues, aside from those relating to infringement, being substantially the same, the above-entitled cases were consolidated for trial.

2. The plaintiff (hereinafter referred to as "Hastings") is a Michigan corporation having its principal place of business at Hastings, Michigan.

3. The defendant, Automotive Parts Corporation (hereinafter referred to as "Automotive"), is an Indiana corporation having a regular and established place of business at Grand Rapids, Michigan.

4. The intervening defendant, The Perfect Circle Company (hereinafter referred to as "Perfect Circle"), is an Indiana corporation having its principal place of business at Hagerstown, Indiana.

5. The defendant, Sealed Power Corporation (hereinafter referred to as "Sealed Power"), is a Michigan corporation having its principal place of business at Muskegon, Michigan.

6. The plaintiff is, and was at the time of filing the complaint herein, the owner of Phillips patent 2,148,997 in suit.

7. This suit is for alleged infringement of United States Letters Patent No. 2,148,-997, granted to Harold P. Phillips, February 28, 1939, on application filed April 16, 1936, for piston ring.

8. Defendants Automotive and Perfect Circle are charged, in Civil Action No. 63, with infringement of claims 2 to 16, inclusive, by the manufacture and sale of Exhibit 14, a piston ring known as General GX Oil Stopper. The same defendants are also charged in that action with infringement of claims 7 and 14 by the manufacture and sale of Exhibit 37, a piston ring known as Triple Action.

9. Defendant Sealed Power is charged, in Civil Action No. 65, with infringement of claims 2, 5, 6, 7, 8, 9, 10, 11, 12, and 14 by the manufacture and sale of Exhibit 15, a piston ring known as Sta-Tite, M. D.

10. The piston rings of the patent in suit and those alleged to infringe are known as oil control rings (as distinguished from compression rings), and are chiefly for replacement purposes in worn and tapered cylinders in internal combustion engines, to avoid the necessity of reboring cylinders, and the high cost thereof.

11. The main objects of the invention are stated in the patent to be:

"First, to provide an improved piston ring assembly which is highly efficient both from the standpoint of effective sealing and also from the standpoint of oil control.

"Second, to provide a piston ring assembly which 'wears in' very quickly and at the same time is very durable.

"Third, to provide a piston ring or piston ring assembly which is highly efficient for use in oversize or rebored or worn cylinders."

12. Claims 5, 6, 8 and 14 are typical claims relied upon by plaintiff and charged to be infringed. These read:

"5. A piston ring assembly comprising spaced thin side members flat on both sides disposed to present their edges to a cylinder wall, an intermediate spacer member disposed between said side members, said intermediate member having a peripheral relatively narrow cylinder contacting rib portion and having drainage openings providing for the passage of lubricant, and an expanding spring arranged within said side and intermediate members in supporting engagement with said side members only and acting to urge them yieldingly outward, said intermediate member being of relatively soft metal as compared to said side members."

"6. A piston ring assembly comprising spaced thin split side members disposed to present their edges to a cylinder wall, an intermediate spacer member provided with a cylinder wall engaging centering portion, said side and intermediate members being disposed side by side for free independent radial movement, and an inner expanding spring in supporting engagement with said side members only and acting to urge them yieldingly outward, said side members being of relatively hard material whereby to withstand the high unit wall tension characterizing the same without excessive wear of the side members."

"8. A piston ring comprising a pair of thin split ring members flat on both sides and disposed to present their outer edges to a cylinder wall, an intermediate spacer member disposed between but free from interlocking engagement with said side members, the combined axial thickness of said side members being substantially less than the axial distance between the same,

and an inner expanding spring contacting said side members only."

"14. A piston ring assembly comprising spaced split thin side members disposed to present their edges to a cylinder wall, a vented intermediate member, said members being disposed side by side for free independent radial movement, and an expander adapted to press outwardly at least one of said side members, said side members being of wear resisting material whereby to prevent excessive wear thereof under high unit wall tension, the combined axial thickness of said side members being less than the axial distance between them."

13. The patent in suit relates to piston rings used in the cylinders of internal combustion engines. The structure illustrated and to which the alleged invention relates comprises two thin side ring members, each having a parting therein and each being normally expansible outward, an intermediate spacing ring member, likewise parted and normally expansible outward, the radial depth of the thin side members being greater than the radial depth of the intermediate spacer ring member. An expander spring member lies within the assembled spacer and side ring members and at installation in a piston ring groove the expander spring member bears against the bottom of the groove and against the inner edges of the thin side members only. The side ring members, while preferably of steel, are not limited to steel alone, and the spacer ring member, while preferably of cast iron, is not limited to such material. The thin side rails are to be of a harder material than the intermediate spacer ring member. The thickness of the side rails is designated as from .020" to .032" but it is stated this may be varied considerably. The thin side members of the ring are flat on both sides and in practice are formed of flat steel stock rolled edgewise. The combined thickness of the spacer and side ring members is such as to make a reasonably close fit within a piston ring groove and at the same time permit expansive movement without binding. The ring disclosed is an oil ring, the intermediate spacer member having oil passages therethrough for oil to pass to the bottom of the piston ring groove and be drained therefrom to the interior of the piston through suitable oil passages leading from the bottom of the ring groove through the walls of the piston. The spacer ring member, in its preferred form, has a continuous thin annular rib at its upper outer portion; and at the lower side of the ring a plurality of spaced slots are cut therethrough to the inner side of the ring to provide oil passages. The construction of ring disclosed in the patent in suit provides a high unit pressure of the thin side members against the wall of a cylinder, the force of the expander thrusting the side members outwardly and with the narrow dimension of the thin side rails providing high unit pressure. The narrow bearing surface of the continuous annular rail of the spacer ring member provides quick "wearing in" of the spacer ring in conjunction with quick "wearing in" of the thin side rails under their high unit pressure.

14. The General GX Oil Stopper ring of defendants Automotive and Perfect Circle differs from the structure and disclosure of the patent in suit as described in finding No. 13 only in the spacer or intermediate member. Considering the spacer or intermediate member of Fig. 8 of the patent in suit, the only difference is that in the "General" ring the spacer has a continuous peripheral groove, whereas, in Fig. 8 this groove is interrupted by short peripherally spaced lands or bridges. In other words, the spacer or intermediate member of the General GX Oil Stopper ring has a peripheral groove, the drain slots opening into the bottom of this groove, whereas, in Fig. 8 of the patent in suit the drain slots extend to the periphery of the member. The preferred embodiment of the spacer or intermediate member of the patent in suit has a single cylinder wall contacting land portion, whereas, in the General GX Oil Stopper ring the spacer or intermediate member has two axially spaced cylinder wall contacting lands or portions. The defendant Perfect Circle placed the General GX Oil Stopper ring on the market in the spring of 1938.

15. Defendant Perfect Circle manufactures and defendant Automotive sells the accused Triple Action ring. This ring comprises thin flat steel split side members co-acting with the spacer and expander, the spacer and expander being combined or made integral instead of being in two parts as shown in the patent in suit and as is the case with the General GX Oil Stopper ring of defendants Perfect Circle and Automotive. There are no cylinder wall contacting portions

322

in this spacer. The combined spacer and expander of the Triple Action ring is formed of ribbon or strip steel. The side members are arranged in relation to the spacer for free independent movement as in the patent in suit, and they are supported in spaced relation for such free independent movement by the spacer. The so-called "whiffle-tree" action of the side members and the high unit pressure of the Phillips patent in suit is present in the Triple Action ring. The defendants' Triple Action ring was placed on the market early in 1940.

16. Sealed Power (defendant in Civil Action No. 65) has, since the issuance of the patent in suit, manufactured and sold piston rings known as Sta-Tite M.D., which rings have two `parted flat steel side rails, a cast iron parted spacer ring between the side rails, and an expander within the side rails and spacer. The spacer is provided with a series of spaced apart consecutive slots around and extending through it, located between the opposed sides thereof. The outer peripheral surface portion of the spacer ring is provided with a plurality of outwardly extending pointed projections with shallow recesses between the projections, the slots extending through the spacer between the projections. The radial depth of the steel side members is equal to or greater than the maximum radial depth of the spacer member, that is, its depth radially at the projecting portions of the spacer member. Defendant Sealed Power placed its Sta-Tite M.D. rings on the market in the spring of 1938.

17. The claims which the several defendants are alleged to infringe are combination claims including four elements in combination, the two side rails, a spacer ring member between them, and an expander at the back of and engaging only the side rails.

18. The patent specification states that the expander is not essential, though sometimes desirable. When used, the expander is supposed to engage only against the side members, the spacer initially being of lesser radial depth than the radial depth of the side members. The experts for the parties agree that it has long been a common and recognized practice for mechanics, garagemen and engineers to use or not use an expander in such installations, and that it was an obvious common expedient, and that it would be no prob-

lem at all for the skilled mechanic to place an expander behind any ring. Phillips states in his patent specification that expanders were known in the art. The exact expander, shown in the Phillips patent, was old and well known.

19. The earliest date established by the record for a production of the alleged invention of the patent in suit is December, 1935, when it was announced to the trade.

20. The following prior art patents and prior uses relied upon by defendants disclose the crowded state of the art at the time of plaintiff's disclosure in December, 1935, and the exceedingly narrow field then existing for exercise of the inventive faculty in the matter of oil replacement rings in old, tapered and worn cylinders:

a. The Teetor patent No. 1,414,796, which was issued May 2, 1922, discloses an oil control ring comprising a single cast iron member having an oil collecting groove in its face and providing narrow cylinder contacting ribs, and slots extending through the ring in the plane of the channel. This ring (with or without an expander) for years has been and is now being manufactured and sold by most of the piston ring companies, including plaintiff and Perfect Circle, for replacement purposes as well as for original equipment in automobile engines.

b. It early became evident to mechanics skilled in the art that if the Teetor ring were split horizontally, independently movable ring sections would be formed and these sections would be permitted, independently of each other, to follow or remain in contact with the cylinder wall which, due to wear and varying temperature conditions, became tapered, uneven and "out of round". The Wilkening Manufacturing Company, at least as early as 1931, placed on the market and advertised such a ring (Ex.DDDD–DD) under the name Pedrick. A similar ring (Exh. FFFF–FFF) is disclosed in the Morton patent No. 1,881,849 which issued October 11, 1932.

c. It also became evident quite early that if the upper and lower portions of the old Teetor ring were independently separated to form distinct laminations of uniform thickness and the laminations were separated by the spacer, the laminations would follow the cylinder wall independently of each other. As early as 1928 the Duoflex Piston Ring Company began to manufacture, sell and advertise

such a ring under the name Duoflex, and such Duoflex rings were successfully used in large quantities and such rings are still being sold and used. The Duoflex ring (Exhs. ZZZZ–Z) comprises the four Phillips' elements; that is, a pair of thin side members, a cast iron spacer between the rails which affords oil ventilation, and an expander which engages only against the side members. The Duoflex rings of ⅛″ size have thin side members which come within the Phillips patent specification which states that his side members are of ".020 to .032 inch thickness", but that this "may be varied considerably". The Duoflex ring is also shown in the Wuerfel patent No. 1,707,035 which was granted March 26, 1929, and the specifications of which state that the ring elements have "maximum of freedom" and "independently and freely" follow the cylinder wall. The side members of the Duoflex rings are formed of cast iron, rather than steel, but the cast iron serves the same purpose as steel and operates as efficiently and has as long, if not longer, life than steel. There would be no invention in substituting steel side members for the cast iron side members of the Duoflex ring or the ring of the Wuerfel patent.

d. The Williams patent, No. 1,764,815, which issued June 17, 1930, likewise discloses a piston ring (Exh.IIII–III) quite similar to the Duoflex ring as the Williams ring comprises two thin, flat cast-iron side members, a cast-iron oil-ventilated spacer between the side members, and an expander engaging the side members.

e. The British patent to Talbot, No. 256,083, of 1926, illustrates and describes an oil ring including two thin, flat side members formed of steel, and a ventilated spacer between the side members and of lesser radial depth than the side members. The description also refers to an expander. Plaintiff's expert conceded that there would be no invention in placing an expander behind the ring shown in Talbot's patent drawings. The Talbot specification states that a "packing member" may be substituted for the wavy spacer shown in his patent drawings and it would not amount to invention to substitute the old Teetor packing ring.

f. The British patent to Marshall, No. 363,478, of 1931, shows a ring similar to the Talbot ring in that Marshall discloses a ring comprising two thin, flat steel side members and a spacer between the side members. Marshall's spacer is somewhat similar to the modified form of spacer shown in Fig. 7 of the Phillips patent. The description of the Marshall patent specifies the same high carbon steel as that used by plaintiff in its Steel-Vent ring.

g. The Marien patent, No. 1,942,967, which issued January 9, 1934, discloses an oil control ring (Exh.LLLL–LLL) comprising a cast-iron spacer, which is nothing more than an old-fashioned Teetor ring, a thin, flat, steel side member below the spacer, and an expander engaging against the spacer. There would be no invention in adding another thin, flat steel side member above the spacer as taught by Duoflex, Talbot, Williams, Powell and others.

h. The earliest date established by the record for a production of the alleged invention of the patent in suit is December, 1935, when it was announced to the trade. Prior to December, 1935, Ole Anderson, of Los Angeles, California, had developed, tested and adopted in his business, and had sold and was selling piston rings having thin steel parted side rails normally expansible outward of a thickness of .025″, assembled one above and the other below an intermediate cast iron parted spacer ring which was provided at its lower side with a plurality of spaced apart openings or slots milled therethrough for oil passage. At the time of manufacture and installation, the radial depth of the steel rails was slightly greater than the radial depth of the cast iron spacer member. A spring expander member was used back of the steel rails and bore against them only when the ring was installed in a piston ring groove. The steel rails were flat on both sides. The axial width of the cast iron spacer member and the two steel rail members was such that the ring when installed in a piston ring groove provided a reasonably close fit therein and at the same time permitted expansive movement without binding in the groove. The cast iron ring member of the Anderson combined cast iron and steel rings was made in two forms, one with a continuous annular thin rib at the upper outer corner of the spacer ring and the other without said rib, both forms having oil passing slots cut in the lower side of the spacing ring. Anderson furnished to the plaintiff, Hastings Manufacturing Company, a set of combined cast iron and steel rings each of which included a cast iron ring member of

the first form, namely, with the narrow annular rail at the upper outer corner portion of the cast iron ring member, in September of 1935, before the announcement date of December, 1935, by the plaintiff of the ring of the patent in suit to the trade. Anderson in his combination cast iron and steel rings used thin steel rails of a slightly dished form as manufactured. The patent in suit shows in the disclosure steel rails which as manufactured and uncontracted will lie flat against opposite sides of the intermediate spacer ring member. All parted steel rails of thin material will dish or depart from the normal plane occupied upon closing at their partings. In the installation in piston ring grooves both the Anderson combination rings and the Hastings combination rings made in accordance with the patent in suit will freely partially enter a ring groove, each having substantially the same amount of axial clearance in the groove over the combined axial dimensions of the ring members of the respective rings; both will distort or dish from their normal positions upon installation in an engine cylinder at which time the ring members are closed at their partings, and the piston ring grooves will be filled in the same manner and each will have substantially the same degree of freedom of movement and lack of binding in the piston ring grooves in operation. In August, 1935, plaintiff's Pacific Coast representative, Kelly, investigated Anderson's activities and reported to plaintiff and to Phillips that some of Anderson's accounts "had been using the rings for over a year and had put them in jobs which were way out of reason and had never failed them." Anderson gave Kelly a set of his rings (Exh. G) for a Ford engine and Kelly forwarded the rings to Phillips. The rings comprised a cast iron spacer, exactly the same as Phillips' preferred form of spacer, a thin steel side member, having an average radial depth greater than the average radial depth of the spacer, and a ventilated expander. The manufacture, sale, installation and successful use of a number of sets of Anderson's rings were proved beyond a reasonable doubt by clear and convincing testimony.

i. In 1933 and 1934, Claud C. Craven, then of Kansas City, Missouri, and now of Centralia, Missouri, was engaged in the manufacture and sale of piston rings. During those years he manufactured and sold combination piston rings (Exhs. WWW; XXX; YYY) which were installed in Model T. Ford trucks of several laundries, including the Fern Laundry Company. Some of the rings, so installed, comprised a cast iron spacer having oil drainage recesses in its lower side, pairs of thin steel side members above and below the spacer and of greater radial depth than the spacer, and an expander engaging only against the steel side members. The Craven rings reduced oil consumption, increased the efficiency of the engines and operated successfully, the rings being used extensively for some time until the Model T. trucks were junked or scrapped. The public sale and use of the Craven rings is established beyond a reasonable doubt.

21. The use of thin side rails thrust outward by an expander spring which engaged the side rails only, and with the side rails separated and held apart by an oil passing intermediate spacer ring member of less radial depth than the side rails was old and common practice exemplified by the Duoflex embodiment of the Wuerfel patent No. 1,707,035.

22. It has long been common practice to supply the thrust force or an added thrust force to a piston ring or piston ring members by using an expander spring. The expander spring is not, however, an essential and in the patent in suit it is so stated. The expander spring provides a thrust force to press the piston ring members against the cylinder wall. This thrust against the cylinder wall may be provided for piston rings in three different equivalent manners: (1) By inherent tension in a piston ring or ring member, having a parting gap, by contracting the ring and closing it at its parting; (2) By an expander spring bearing against a piston ring or ring member which has little or no inherent tension because of little or no normal gap at its parting; and (3) The thrust of an expander added to that inherently produced in the ring member upon its contracting or closing at its parting.

23. The ring elements or sections of Duoflex, Wuerfel, Talbot, Williams, Marshall, Anderson, and Craven rings have independent movement and have sufficient freedom of movement to permit the ring sections to follow the cylinder wall. The matter of freedom of movement is merely one of degree and depends on many factors, including inertia forces, friction, width of the piston groove, wear and tension. Rings

with some side pressure may have greater freedom of movement than rings with lesser or no side pressure.

24. "High unit pressure" or "tension" is merely a term of degree. Phillips' patent description makes no reference to any degree of pressure or tension of the side members of the ring against the cylinder wall.

25. The alleged Phillips combination is old in the prior art and every element recited in claims 2 to 16, inclusive, of the Phillips patent was old and well known. The structures defined in the claims are lacking of invention over the prior art.

26. The disclosure of the Phillips patent, as construed by plaintiff and its patent expert, is indefinite, incomplete and ambiguous, in that the description and drawings are silent and insufficient as to the clearance and freedom of movement of the ring parts, as to the degree or extent of flatness or dish of the side members, as to the degree or extent of the unit pressure, and as to the degree or extent of the spacing of the rails apart.

27. The claims of the Phillips patent here in suit, as construed by plaintiff and its expert, are indefinite, incomplete and ambiguous, and are not in such full, clear, concise and exact terms as to enable persons skilled in the art to make and use the structure.

### Conclusions of Law.

1. Each of the claims 2 to 16, inclusive, of the Phillips patent is invalid because of anticipation by the prior art.

2. Each of the claims 2 to 16, inclusive, of the Phillips patent is invalid for lack of invention over the prior art.

3. Each of the claims 2 to 16, inclusive, of the Phillips patent is invalid because its disclosure is not "in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make, construct, compound, and use the same;", and for failure to "particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery".

4. Each of the claims 2 to 16, inclusive, of the Phillips patent is invalid because its claims are drawn to an exhausted combination and to mere aggregation.

5. The "Triple Action" ring does not infringe claims 7 and 14 of the Phillips patent.

6. The "General GX Oil Stopper" ring does not infringe claims 2 to 16, inclusive, of the Phillips patent.

7. The "Sta-Tite M. D." ring does not infringe claims 2, 5, 6, 7, 8, 9, 10, 11, 12, or 14 of the Phillips patent.

8. Decrees dismissing the complaints involved herein may be submitted for signature on or before May 15, 1941.

### Opinion.

The accompanying findings of fact and conclusions of law state the issues involved, the facts established by the evidence, and the legal conclusions therefrom. The controlling issue is whether or not, in view of the established prior art, the Phillips patent is invalid either for lack of invention, or for failure to comply with R.S. 4888, 35 U. S.C.A. § 33.

The difficult problem, as is true with all familiar combinations of old elements, is to determine whether, in the light of the prior art, the asserted advance is one involving the exercise of inventive faculty beyond the skill of the art. If, in view of the existing prior art and practices, there is but routine response to the claimed need for high unit pressure, low total pressure, or free independent radial movement of the ring members in the piston groove, invention is not present.

It has been frequently stated that the existence of invention should be determined from the standpoint of one skilled in the art. See Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 79 F.2d 948, 952. Plaintiff's expert, long skilled in the pertinent art, after meticulous analysis of the patent, thus stated the advance disclosed, "The various mechanical elements which have been assembled together in the various claims, to define certain combinations, are very noticeable, but all through all of the claims, all through all of the various combinations which are covered by the illustrations or described in the specifications, or covered by the claims in the Phillips patent, as well as all of the defendants' structurees in this suit * * * are based upon a rather definite combination, * * * which perhaps might be called the heart of the Phillips invention. I speak of this pair of spaced thin steel side members, co-acting with an expander, also with an intermediate spacer member, in such a manner as to provide high unit pressure between side

members of the ring and the cylinder wall, and to provide free, independent, radial movement of the ring members in the groove, and always with low total pressure of the ring on the cylinder wall."

The "heart" of the alleged invention is thereby clearly shown to rest in "high unit pressure", "free, independent radial movement", and "low total pressure". In other words, the patent rests upon interpretations and applications of the comparative adjectives, "high", "free", "independent", and "low", which may vary substantially. As was said of "rigidity" and "flexibility" in the case of Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 58, 59 S. Ct. 8, 13, 83 L.Ed. 34:

"The properties of any given material are many and diverse. The antithetical qualities of rigidity and flexibility of a structure are not absolute but relative; it may be more rigid than some and more flexible than others; too rigid for some purposes and too flexible for others. The one quality may be increased and the other diminished by ·choice of materials from which the structure is made and by variation in its proportions. If invention depends on emphasis of one quality over the other, as the court below found was the case with the laterally flexible webs in the Gulick device, the statute requires that emphasis to be revealed to the members of the public, who are entitled to know what invention is claimed. * * *

"As already indicated, the omission from the specifications was not supplied by the drawings, which failed to disclose by dimensions the proportions of the webs. Inherent flexibility of the web in cooperation with the slit skirt cannot be depended upon to produce the desired effect in rendering the skirt yieldable in response to cylinder wall pressure. As respondent's own expert testified, that depends upon design of the web,. with correct proportioning of the different parts as to location and thickness to produce lateral flexibility. Inherent rigidity, made more effective by design of the webs, would correspondingly curtail the desired effect."

And in the later case of Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 214, 61 S.Ct. 235, 236, 85 L.Ed. ——, it was said of the same patent: "Upon an examination of the Gulick application before amendment and the Maynard patent we concluded, 305 U.S. 47, 59 S.Ct. 8, 83 L.

Ed. 34, that neither described or claimed flexible or yieldable webs as an element in the patented inventions. For that reason alone we held that if the flexible web constituted an essential element of the inventions both patents failed to satisfy the requirement of the statute that the patentee describe his invention so that others may construct and use it after the expiration of the patent and that it 'inform the public during the life of the patent of the limits of the monopoly asserted, so that it may be known which features may be safely used or manufactured without a license and which may not.' Permutit Co. v. Graver Corp., 284 U.S. 52, 60, 52 S.Ct. 53, 55, 76 L. Ed. 163 * * *."

▮ The patentee in the instant case has, expressly in several of the claims in suit and by necessary implication in the remaining claims, made use of indeterminate adjectives in describing functions and in reciting what was already well known in the art, and then used "conveniently functional language at the exact point of novelty". Such practice was condemned in the case of General Electric Co. v. Wabash Corp., 304 U.S. 364, 371, 58 S.Ct. 899, 902, 82 L.Ed. 1402:

"The claim uses indeterminate adjectives which describe the function of the grains to the exclusion of any structural definition, and thus falls within the condemnation of the doctrine that a patentee may not broaden his product claims by describing the product in terms of function. Claim 25 vividly illustrates the vice of a description in terms of function. 'As a description of the invention, it is insufficient, and, if allowed, would extend the monopoly beyond the invention.' The Court of Appeals for the Ninth Circuit relied on the fact that the description in the claims is not 'wholly' functional. Anraku v. General Electric Co., 80 F.2d 958, 963. But the vice of a functional claim exists not only when a claim is 'wholly' functional, if that is ever true, but also when the inventor is painstaking when he recites what has already been seen, and then uses conveniently functional language at the exact point of novelty.

"A limited use of terms of effect or result, which accurately define the essential qualities of a product to one skilled in the art, may in some instances be permissible and even desirable, but a characteristic essential to novelty may not be distinguished

from the old art solely by its tendency to remedy the problems in the art met by the patent. * * *"

In the instant case, the interpretation of the patent by plaintiff's expert recites well-known elements in familiar combination but at the point of novelty uses indeterminate adjectives descriptive of function. This evidently correct analysis of what the patent really discloses by way of invention is fatal to the claims in suit. For example, the specifications of the patent state that the rails or side members are formed of stock .020 to .032 of an inch in thickness. There is then the further statement that "this may be varied considerably". Upon inquiry concerning what range of variance in the thickness of the rails would still be within the teachings of the patent, plaintiff's expert replied:

"I would not be able to give it in thousandths of an inch, I would say probably up and down until you have changed the functioning.

*  *  *  *  *

"Q. But the specification also shows that that can be changed considerably. I want to find out what you would consider coming within the teaching of the patent in that respect. Would you say that that rail that was fifteen-thousandths thickness came within the patent? A. Probably functioning the same as 25 thousandths. I would say that you can't guess. That is all that would be, if you and I, in speculating what the changes in thousandths of an inch would be. I say, as long as you maintain the functioning that you get with these dimensions, it would be all right.

"Q. Then the patent leaves you in a position where you must speculate? A. I say you would have to run some tests. I say you and I would have to speculate here without any reliable test to determine it."

When expert interpretation of the teachings of a patent discloses that the ultimate test of infringement lies in experiments to ascertain the degree of results achieved by an accused structure, and not in the combination or arrangement of elements, it is obvious that the alleged inventive concept lies in the function or results and not in the thought of combining certain elements.

There is little in the disclosure of the patent concerning "free and independent radial movement" and nothing to define its limitations. There is nothing concerning "low total pressure", and the term "unit pressure" is referred to only incidentally. Nowhere in the specifications or claims is their importance made manifest nor is any attempt made to limit or define these terms. It is evident that the term "free movement" is one of degree and that the degree is a matter of choice by different manufacturers. The methods of obtaining the desired results are fully disclosed by prior art. The term "high unit pressure" is likewise merely a matter of degree, but the patent in suit is wholly silent as to what it should be.

From the foregoing it appears that even to the unskilled, it should be clear that all manufacturers of piston rings must select and design, in so far as axial and radial dimensions of the ring are concerned, those rings which will have such freedom of movement in the ring groove that the ring will freely follow the cylinder wall and that it will not become wedged or jammed in the ring groove so tightly that it becomes sluggish and will not serve its purpose of effectively engaging the cylinder wall.

It follows that the Phillips patent is invalid for indefiniteness, incompleteness and ambiguity, under the provisions of R. S. 4888. See The Incandescent Lamp Patent, 159 U.S. 465, 16 S.Ct. 75, 40 L.Ed. 221; General Electric Co. v. Wabash Corp., 304 U.S. 364, 368, 58 S.Ct. 899, 82 L.Ed. 1402.

Consideration of the claims in suit, the drawings, specifications and main objects of the invention brings the conclusion that the patentee, working in a crowded art, has sought a monopoly of elements which were old and well known, in a combination which likewise was old, and that he has succeeded in obtaining the issuance of a patent which rests solely upon allegedly improved functions.

The judgment of the court is that the claims alleged to be infringed are invalid, and that therefore the charges of infringement are not sustained.